CITIZENS STATE BANK OF LOMETA, Plaintiff–Appellee,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver of North Central National Bank, Defendant–Appellant.

No. 90–8607.

United States Court of Appeals, Fifth Circuit.

Nov. 4, 1991.

Scott N. Morse, Brown, Maroney & Oaks Hartlins, Austin, Tex., Gregory E. Gore, FDIC, Washington, D.C., for defendant-appellant.

Richard Brophy, Jr., Elizabeth S. Miller, Naman, Howell, Smith & Lee, Waco, Tex., for plaintiff-appellee.

Before KING and DUHÉ, Circuit Judges, and SCHWARTZ, District Judge.[1]

CHARLES SCHWARTZ, Jr., District Judge:

This appeal arises out of the insolvency and receivership of the North Central National Bank, Austin, Texas ("North Central"). The Federal Deposit Insurance Corporation ("FDIC") as receiver published notice of North Central's failure immediately upon its closure on April 23, 1987. This raises questions regarding the rights of standby letter of credit beneficiary Citizens State Bank of Lometa ("Citizens") in the bank insolvency proceedings. The parties filed cross motions for summary judgment. The FDIC appeals from the summary judgment entered against it as the receiver of the insolvent bank North Central.

The issues on appeal are: (1) whether the district court erred in finding three standby letters of credit issued by North Central in favor of Citizens, provable against the Receiver, FDIC, in light of the undisputed fact that Citizens did not attempt to draw on the letters of credit until after North Central was declared insolvent; and (2) whether post-judgment interest was properly awarded to Citizens under the National Bank Act.

The material facts bearing on the appeal which were the subject of joint stipulations of the parties are more fully discussed below.

## I.  FACTS.

On or about November 17, 1986, Lampasas 620 Joint Venture ("Joint Venture") executed a promissory note in the principal amount of $295,200 ("Note"). The Note was made payable to Citizens. Three partners of the Joint Venture, Jason Kuenstler, Stan Meeks, and Decker McKim, signed the Note as makers and in their capacities as partners. Additionally, each of the signatories executed guaranty agreements in their individual capacities providing that they would individually guarantee portions of the Note—that is, individual guaranties of payment of the Note were made by Kuenstler in the amount of $18,000, Meeks in the amount of $46,800, and McKim in the amount of $64,800.

In consideration for the Note and the guaranties, and at the instance of the aforementioned three partners, North Central issued three letters of credit in favor of Citizens. The letters of credit, each dated October 15, 1986, issued in the following amounts: (1) $18,000 for the account of Kuenstler; (2) $46,800 for the account of Meeks; and (3) $64,800 for the account of McKim. Payment pursuant to the letters of credit by North Central to Citizens was predicated on its presentment of the following to North Central: (a) the original letter of credit; and (b) written notification for an officer of Citizens certifying that the $295,200 loan to the Joint Venture is in default. It was further provided in the letters of credit that upon presentment of a draft in compliance with the terms of the letters, North Central would honor the draft.

On April 23, 1987, the Comptroller of the Currency of the United States declared North Central insolvent, ordered it closed, and appointed the FDIC as Receiver.[2] All three October 15th, 1986 letters of credit were in existence prior to the closing of North Central. The FDIC immediately published the notice of North Central's failure for the required three-month period in accordance with 12 U.S.C. § 1821(d).

On July 15, 1987, the Joint Venture, along with the three individual guarantors, defaulted on the Note and the individual guaranties. The Note is presently in default.

On August 13, 1987, Citizens sent to the FDIC the following documents: (1) copies of original letters of credit; (2) written

1.  Senior District Judge of the Eastern District of Louisiana, sitting by designation.

2.  The Comptroller of the Currency is empowered under the National Bank Act to place a national bank in receivership whenever he "shall become satisfied of the insolvency of the bank." 12 U.S.C. § 191. Since enactment of Federal Deposit Insurance Act, the receiver appointed by the Comptroller for the national banks must be the FDIC. 12 U.S.C. § 1821(c).

notice, certifying that the $295,200 loan to the Joint Venture was in default; and (3) drafts in the amount of the letters of credit. By its letter of October 8, 1987, the FDIC acknowledged receipt of the above-enumerated documents.

On October 13, 1987, Citizens sent to FDIC the following: (1) original proofs of claim on each of the letters of credit; (2) the original letters of credit; (3) written notice certifying that the loan to the Joint Venture was in default; and (4) drafts in the amounts of the letters of credit. By letter dated October 15, 1987, the FDIC notified Citizens that its claim had been rejected, stating that the Note was not in default prior to North Central's failure. Subsequent correspondence of the FDIC dated May 26, 1988 and June 7, 1988, notified Citizens that the claims remained denied because they were not "provable claims" (i.e., they were not "fixed and certain" as of the date of North Central's failure).

In 1988 and 1989, Citizens obtained judgments on the Note and guaranty agreements: (1) against the Joint Venture— $180,586.32, plus $13,000 reasonable attorney's fees, plus interest on these amounts at 18% per annum from June 30, 1988 until paid; and (2) against Kuenstler, Meeks, and McKim in the respective amounts of $21,098.80, $60,300.93, and $77,363.13, plus in each case interest and attorney's fees.

FDIC has not made any distribution of assets in the receivership proceeding relating to North Central. The unpaid principal of the Joint Venture has at all times exceeded $150,000 and no term of the letters of credit issued by North Central has been altered or amended.

## II. APPEAL OF FDIC.

### A. Provable Claims under Section 194 of the National Bank Act.

As receiver of North Central, FDIC is responsible for marshalling the bank's assets and distributing them ratably "on all such claims as may have been proved to [the receiver's] satisfaction."[3]

The distribution of assets of an insolvent national bank by the FDIC is a matter of federal law:

> Under the relevant provisions of the National Bank Act (12 U.S.C. §§ 191–200) and the Federal Deposit Insurance Act (12 U.S.C. §§ 1811–32) Congress has established a complete system for the administration and liquidation of insolvent banks *for the benefit of creditors* with the receiver acting as the administrative agent of the Comptroller of the Currency. The Acts constitute a complete plan for the establishment and government of national banks....[4]

When the FDIC acts in its corporate capacity as receiver of a national bank, federal law applies.[5]

Relying on *First Empire Bank–New York v. FDIC;*[6] *FDIC v. Liberty National Bank and Trust Co.;*[7] and *Inter-*

3. 12 U.S.C. § 194. *See also, Interfirst Bank–Abilene v. FDIC,* 777 F.2d 1092, 1094 (5th Cir. 1985).

4. *FDIC v. Grella,* 553 F.2d 258, 261 (2nd Cir. 1977) (citations omitted and emphasis supplied).

5. *Interfirst Bank–Abilene,* 777 F.2d at 1094; *FDIC v. Bank of America,* 701 F.2d 831 (9th Cir.1983).

6. 572 F.2d 1361, 1368 (9th Cir.), *cert. denied,* 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978). In *First Empire,* the Ninth Circuit held that certain standby letters of credit, though classified as contingent claims at the time of insolvency, were considered "provable" under equitable principles, because liability thereunder was absolute and certain in amount when the suit was filed against the receiver, and the claims against the receiver were made well in advance of any distribution of assets of the receivership. The court in *First Empire* agreed with the statement of the Second Circuit in *Penn Steel v. New York City Railway Co.,* 198 F. 721, 741–42 (2nd Cir. 1912), to the effect that there exists no equitable reason why the time of the appointment of the receiver should determine the "provability of claims" which are certain when presented and which are presented in time. Such claims "'should have been certain at some arbitrary anterior period.'" *First Empire,* 572 F.2d at 1369 (citing *Penn Steel, supra* ).

7. 806 F.2d 961, 966 (10th Cir.1986). In *Liberty National Bank,* the FDIC similarly argued that because the defendants did not draw on the letters of credit at issue therein until after the bank was declared insolvent, their claims were

*first Bank–Abilene v. FDIC,*[8] the district court in the case at bar held that Citizen's claims, pursuant to the standby letters of credit issued by North Central, were "provable" against FDIC, within the meaning of Section 194 of the National Bank Act.

The National Bank Act addresses the establishment, regulation, and liquidation of national banks, and provides in pertinent part the following:

> [T]he Comptroller [receiver] shall make a ratable dividend of the money paid over to him ... on all such claims as may have been proved to his satisfaction or adjudicated in a court of competent jurisdiction....

12 U.S.C. § 194. The National Bank Act itself does not otherwise set forth specifically the requirements of a "provable claim." The lack of said specifics, was recognized early on by the Supreme Court in *American Surety Co. v. Bethlehem National Bank,* 314 U.S. 314, 316, 62 S.Ct. 226, 227–28, 86 L.Ed. 241 (1941), which held that Congress chose instead that "'just and equal distribution' of an insolvent bank's assets" be achieved "through the operation of familiar equitable doctrines" fashioned by the courts. *Id.*

The *First Empire* decision is indistinguishable from the case at bar. The test of "provability" set forth in *First Empire* was adopted by the Tenth Circuit in *Liberty National Bank,* and this circuit in *Interfirst Bank–Abilene.* In *First Empire,* the court concluded that claimant's standby letter of credit claim was provable even though the default on the underlying note occurred subsequent to the issuer's insolvency, based on the following criteria:

1) it existed before the issuing bank's insolvency and did not depend on any new contractual obligation arising later; [9]

2) liability on the claim was absolute and certain in amount when suit was filed against the receiver; [10] and

3) the claim was made in a timely manner.

572 F.2d at 1367–69.

The FDIC disputes neither the facts nor that Citizen's claim meets *First Empire*'s

not "fixed" but "contingent" as of the date of insolvency, and therefore not provable against the FDIC as receiver. The Tenth Circuit adopted the "provability" test set forth in *First Empire,* as to standby letters of credit even when no draft has been presented prior to insolvency, to wit: (1) that claims must have been in existence prior to insolvency and must not be dependent on new contractual obligations arising after insolvency; (2) that total liability be certain at the time the beneficiaries sue the issuer's receiver; and (3) that the claims be made timely, i.e., before assets are distributed from the receiver's estate.

**8.** 777 F.2d 1092, 1094 (5th Cir.1985). This court in *Interfirst Bank–Abilene,* also adopted the three-part test devised by the *First Empire* court, and based thereon, determined that breach of contract and fraud claims could be set off against a correspondent account after insolvency. This court specifically held that Interfirst's contract and fraud claims were provable against the FDIC. Interfirst's fraud claim pre-dated the insolvency at issue, and was absolute in amount when Interfirst first filed suit as required by *First Empire. Interfirst Bank–Abilene,* 777 F.2d at 1095.

**9.** The court in *First Empire* distinguished *Kennedy v. Boston–Continental National Bank,* 84 F.2d 592 (1st Cir.1936), *cert. denied,* 300 U.S. 684, 57 S.Ct. 667, 81 L.Ed. 887 (1937), involving a lessor

of property, wherein the lessor, following default by the national bank lessee, sought to exercise an option given him by the lease to obtain liquidated damages. The distinction lies in the court's reliance on the "new contract" principle, that a new contract came into being at the time by re-entry by the lessor to exercise the option. *See also, Argonaut Savings & Loan Ass'n v. FDIC,* 392 F.2d 195, 197 (9th Cir.), *cert. denied,* 393 U.S. 839, 89 S.Ct. 116, 21 L.Ed.2d 110 (1968), *FDIC v. Grella,* 553 F.2d 258, 262 (2nd Cir.1977), each case dealing with an exercise of an option to obtain liquidated damages for the loss of future rent and turning on the "new contract" principle. The claims in the case at bar, similar to those in *First Empire,* were, rather, based upon letters of credit in existence before the insolvency of the issuer and *not* dependent on any new contractual obligation arising later.

**10.** The *First Empire* court agreed with the Second Circuit's statement in *Penn Steel,* to the effect that there is no equitable reason why claims which are certain when presented and which are presented in time should not have been certain at some arbitrary anterior period. The claims which were the subject of suit in *First Empire,* as well as in the instant case, were absolute and certain as of the time suit was filed against the receiver, and made in a timely manner, well before any distribution of assets of the receivership.

"provability test." Rather, the FDIC's argument rests on a whole host of *factually* inapposite Supreme Court decisions discussed below in some detail, which focus on the concept of "ratable distribution" [11] as opposed to the nature of a "provable" claim.

In *United States ex rel. White v. Knox*, 111 U.S. 784, 4 S.Ct. 686, 28 L.Ed. 603 (1884), the question before the Court was whether a distribution should be calculated based on the amount of the claim on the date of insolvency or whether the creditor should be allowed to include the interest accrued post-insolvency. In *White*, the creditor had obtained a judgment against the receiver which included interest accrued post-insolvency. The Court concluded that it would not be "ratable" to allow one creditor to include interest and other creditors not to include interest, and therefore the creditor's "ratable portion" of a dividend was determined as of the date of insolvency. Nowhere in its decision in *White*, did the Court equate "provability" of claims with the absolute, fixed, due-and-owing language which applies to the concept of a "ratable distribution." Provable claims were defined as claims which are "shown ... to have their origin in something done before the insolvency." 111 U.S. at 787, 4 S.Ct. at 687.

In *Scott v. Armstrong*, 146 U.S. 499, 13 S.Ct. 148, 36 L.Ed. 1059 (1892), a set off case, the insolvent bank owed a promissory note which was not due on the date of insolvency. The issue before the Court was whether the holder of the note could set off funds it owed to the insolvent bank based on the promissory note which was not mature on the date of insolvency. The Court allowed the set off based on equitable principles, stating that the National Bank Act was not intended to alter existing rights, including the right of set off.

Both *Merrill v. National Bank of Jacksonville*, 173 U.S. 131, 19 S.Ct. 360, 43 L.Ed. 640 (1899), and *American Surety Co.*

*v. Bethlehem National Bank*, 314 U.S. 314, 62 S.Ct. 226, 86 L.Ed. 241 (1941), dealt with the case of the secured creditor and "ratable distribution" of dividends. In *Merrill,* the issue before the Court was whether the value of the secured creditor's claim should be calculated on the date of insolvency, with or without credit for collateral or collections made post-insolvency. In other words, the issue before the Court was the basis for calculating the creditor's ratable portion of a dividend, and not whether the creditor's claim was provable pursuant to section 194 of the National Bank Act.

The *American Surety* case [12] is similar to *Merrill,* except that *American Surety* involved a surety who had collateral. The issue therein, which the Court answered in the negative, was whether the surety had to reduce the claim by collections occurring post-insolvency.

■ Essentially, the FDIC argues that no reference whatsoever should be made to post-insolvency events, and that a claim must be "absolutely" *fixed, due,* and *owing* as of the *date of insolvency* to be "provable," and therefore entitled to participate in the ratable distribution of funds with regard to insolvent national banks. Its argument is premised on the basic misconception that guidelines set forth in decisions of the Supreme Court pertaining to "ratable distribution" apply with equal force to the determination of whether a claim is provable within the meaning of section 194. Though related concepts, whether a claim is provable under section 194, and whether a distribution is "ratable" represent two entirely different inquiries.

Appellant's militant stand against reference to post-insolvency occurrences in determining the "provability" of claims, when carried to its logical conclusion, would in certain instances result in the secured creditor receiving more than his ratable share (e.g. the secured creditor who collects dividends based on the entire amount of the

---

**11.** "Ratable distribution" involves calculating the creditor's share of a dividend, so that each creditor receives his fair share of the payment as it relates to the total sum to be distributed.

**12.** 314 U.S. 314, 62 S.Ct. 226, 86 L.Ed. 241 (1941).

debt, and also recovers from the sale of collateral). Appellant's position would further dictate a result at odds with this court's decision in *Pinckney v. Wylie*, 86 F.2d 541 (5th Cir.1936).

In *Pinckney*, the noteholder (Wylie) asserted a claim against the insolvent national bank (Belton National Bank) which had guaranteed payment of the note. The note was secured by trust deeds on land, having the effect of mortgages, and a retained vendor's lien. Belton National Bank purchased the land from the original purchasers and makers of the notes, in liquidation of their indebtedness to the Bank, assuming the purchase money debt in the amount of $7,000. The Bank then sold the land to an individual who later renewed two of the notes, which the Bank guaranteed. The Bank then became insolvent.

The principal issue in *Pinckney* was "ratable distribution," i.e., whether the Bank's liability would be based on the entire indebtedness or the amount after crediting the debt with proceeds from the sale of collateral. This court, of necessity, had to recognize the "provability" of the noteholder's claim against the Bank based upon its obligation as surety/guarantor.

*Pinckney* stands for the proposition that an obligation under a guaranty is provable. The obligation under a letter of credit considered herein is perhaps more absolute than that under a guaranty, considered in *Pinckney*.

### B. *Standby Letters of Credit.*

■ At this point, some discussion appears to be in order regarding the nature of the standby letter of credit. The standby letter of credit is a "hybrid" financing mechanism, borrowing features from both the guaranty and commercial letter of credit. Like a guaranty agreement, the standby letter of credit may be drawn upon only in the event of the default of a debtor whose loan is collateralized by the letter of credit. However, the standby letter of credit, like the commercial letter of credit evidences, a principal, as opposed to ancil-

lary, obligation—that is, the issuer's liability attaches pursuant to the issuer's own terms, without regard to performance of the underlying contract. In other words, the issuer of a standby letter of credit has a duty to pay which arises upon presentation of the complying documents. "The principal difference between the traditional letter of credit and these newer standby letters of credit is that, whereas in the classical setting the letter of credit contemplates payment upon performance, the standby credit ... contemplates payment upon failure to perform."[13]

The term standby letter of credit is defined at 12 C.F.R. § 32.2(e) (emphasis added) as follows:

> A 'standby letter of credit' is any letter of credit, or similar arrangement, however named or described, which represents an obligation to the beneficiary on the part of the issuer (1) *to repay money borrowed by* or advanced to or for the account party, or (2) *to make payment on account of any indebtedness* undertaken by the account party, or (3) *to make payment on account of any default* by the account party in the performance of an obligation.

The plain definition of this financing mechanism belies appellant's contention that the parties do not expect that the standby letter of credit will ever be utilized. The Code of Federal Regulations further provides at section 32.2(a) and (d) that, for the purposes of calculation of the amount of loans and extensions of credit to any one borrower, both standby letters of credit and guaranties are considered loans or extensions of credit, i.e., as any "direct or indirect advance of funds." 12 C.F.R. § 32.2(d). Thus, the lending limit regulations treat a standby letter of credit not as contingent liability, but as a loan—that is, as though the credit had been extended as of the date of commitment.

### C. *Provability—Principles of Equitable Receivership.*

The salient fact here is that Citizens' rights and claim against North Central

---

**13.** *First Empire,* 572 F.2d at 1367 (citing Katsckee, *The Standby Letter of Credit Debate—the* *Case for Congressional Resolution,* 94 Banking L.J. 697, 699 (1975)).

*originated* from the standby letters of credit issued by North Central long before its insolvency was declared. In *Merrill*, 19 S.Ct. at 366, the Supreme Court merely required payment of dividends ratably, that is to say, proportionately according to some uniform rule. The Court explained that the business of the Bank must stop when insolvency is declared and the only claims that can be recognized are those shown " 'to have their origin in something done before the insolvency.' " *Id.* The Court recognized that, in the case of the secured creditor who recovers from the sale of collateral, dividend payments from the estate being administered should cease at the time his claim has been fully satisfied with collateral proceeds and dividend payments. That certain post-insolvency events may cause dividend payments to cease does not render the secured creditor's claim uncertain, *not* "fixed," or *not* absolute as of the date of insolvency.

In *American Surety Co.*, the Supreme Court recognized an equitable right and allowed a claimant to prove a claim it did not have on the date of insolvency. The Court allowed the surety company to rely on the equitable rule of subrogation in order to assert the amount of the depositor's claim against the bank. Unquestionably, ratable distribution requires that dividends be *declared proportionately* upon the amount of claims as they stand on the date of insolvency. 62 S.Ct. at 228. As to the "provability of claims," the Court expressed no opinion. The Court explained that "to be 'ratable,' the claims must be manifestly estimated as of the same point in time, and that date has been adjudged to be the date of insolvency." *Id.* The Court's further comments as to any limitation of the surety's participation are even more illustrative of its position that "ratable" distribution comport with intrinsic fairness, to wit:

> On the other hand, if the surety's participation should be limited to the extent now urged by the receiver, the other creditors would profit solely because of fortuitous circumstances and without

any relation to reasons of intrinsic fairness.

*Id.* at 228–29.

In the case at bar, Citizens' claim has its origin in the letters of credit issued by North Central prior to its insolvency. That liability thereunder was actually triggered by default on the Note which occurred shortly thereafter cannot be said to completely eradicate that contractual liability which originated from standby letters of credit pre-dating North Central's insolvency.

The Supreme Court in *Merrill*, explained its statements regarding ratable distribution as follows:

> Whatever congress may be authorized to enact by reason of possessing the power to pass uniform laws on the subject of bankruptcies, it is very clear that it did not intend to impinge upon contracts existing between creditors and debtors, by anything prescribed in reference to the administration of the assets of insolvent national banks....
>
> The requirement of equality of distribution among creditors by the national banking act involves no invasion of prior contract rights of any such creditors, and ought not to be construed as having, or being intended to have, such a result.

19 S.Ct. at 366–37.

As it did in *Liberty National Bank*, the FDIC herein seeks "too narrow an interpretation" of ratable distribution of assets pursuant to section 194 of the National Bank Act. 806 F.2d at 965. Nothing in section 194, *Merrill* or *American Surety Co.*, requires a holding under the instant facts that North Central's obligation to pay a fixed amount upon the occurrence of a specific event is obviated by its insolvency pre-dating the triggering event, i.e., default on the Note. The Tenth Circuit in *Liberty National Bank*, citing *Merrill*, observed that "it is as much the purpose of the insolvency statutes to preserve the rights existing at the time of insolvency as to prevent new rights from arising thereafter." [14] 806 F.2d at 965.

---

**14.** *See also, Scott v. Armstrong*, 146 U.S. 499, 509, 13 S.Ct. 148, 151, 36 L.Ed. 1059, 1063

The existing Supreme Court case law does not address all types of claims and has not set forth any "mechanistic" provability test applicable to all types of negotiable instruments, including hybrids such as the standby letter of credit at issue in this case. Rather, the Court opened the door for the courts to apply equitable doctrines, apparently in harmony with the purpose of the National Bank Act scheme, that is, the liquidation of national banks "for the benefit of creditors." [15]

In *Sisalcords Do Brazil, Ltd. v. Fiacao Brasileira De Sisal, S.A.*, 450 F.2d 419 (5th Cir.1971), as appellant represents, this court addressed the nature of letters of credit. We reviewed the dismissal of an action seeking to enforce a default judgment by means of attachment of an "open" letter of credit [16] issued by a Louisiana state bank. However, this Court's determination that the state bank did not have absolute liability under those letters of credit was predicated on Louisiana law of attachment and not the National Bank Act, to wit: "Under Louisiana law the efficacy of an attachment is determined according to the facts existing at the date of issuance of the writ and, if defective, it is not cured by subsequent events." 450 F.2d at 422. Louisiana law of attachment does not allow resort to equitable doctrines. Therefore the court in *Sisalcords* concluded that the state bank's liability thereunder was not absolute.

The issue before the court in *Sisalcords* was whether the contractual obligation of the state bank under the letters of credit was a "debt" owing to the defendant by the garnishee within the meaning of the Louisiana law of attachment,[17] and therefore subject to attachment. Although the issue before this court in the present case is similar, the applicable law is the National Bank Act, which contemplates equitable doctrines fashioned by the courts. Other than providing us with some general definition and guidance as to the nature of letters of credit, *Sisalcords* is inapposite *sub judice*.

We can find no equitable reason in the present case why the time of appointment of the receiver should determine the "provability" of claims under the standby letters of credit. Liability on the standby letters of credit was absolute and certain in amount when this suit was filed against the receiver. By that time, the principals had defaulted on the primary loan obligations. The claims against the receiver were made in a timely manner, well before any distribution of assets of the receivership. We conclude that the claims of appellees under the standby letters of credit were provable in the face amount in the receivership. " '[T]here is no equitable reason ·why claims which are certain when presented and which are presented in time should have been certain at some arbitrary anterior period.' " [18]

### D. *Post–Insolvency Interest.*

■ The courts have consistently denied post-insolvency interest, as such an award would violate the rules of "ratable" distribution. The exceptions to this rule are where the assets of the receivership are

(1892) ("In the case at bar the credits between the banks were reciprocal, and were parts of the same transaction, in which each gave credit to the other on faith of the simultaneous credit, and the principal applicable to mutual credits applied. It was, therefore, the balance upon an adjustment of the accounts which was the debt, and the Farmers' Bank had the right, as against the receiver of the Fidelity Bank, although the note matured *after* the suspension of that bank, ... unless the national banking law were to the contrary." The Court concluded set off should have been allowed).

**15.** *See, Merrill,* 19 S.Ct. at 366–67; *Liberty National Bank,* 806 F.2d at 965; *Grella,* 553 F.2d at 261.

**16.** The term "open" refers to the fact that the letter of credit had not been drawn upon by the account party.

**17.** The *Sisalcords* Court stated: "Louisiana courts have determined that only property held by a garnishee, or debts absolutely due by him, though not exigible, at the moment interrogatories are served are subject to seizure under a garnishment procedure." 450 F.2d at 423.

**18.** *First Empire,* 572 F.2d at 1369 (quoting, *Penn. Steel Co. v. New York City Ry. Co.,* 198 F. 721, 742 (2nd Cir.1912)).

sufficient to pay all provable claims in full,[19] or where the receiver is shown to be unreasonable or otherwise at fault denying the claim and/or administering the trust.[20]

Citizens does not argue that it *is* entitled to interest, but rather that it *may be* entitled to interest based on the aforementioned exceptions to the rule.

The facts of this case do not allow for a determination that any award of post-insolvency interest was proper. If indeed the lower court intended to award such interest, it was in error. Unless and until there is a showing that the receivership has funds sufficient to pay all provable claims in full, or that the receiver was unreasonable in denying Citizens' claim, or was otherwise at fault in administering the trust, any award of post-insolvency interest is proscribed.

## III.  CONCLUSION.

The district court correctly applied the *First Empire* test as to provability of the standby letters of credit, and found Citizens' claim pursuant thereto provable as against the receiver, FDIC. If it was the intention of the district court to award post-insolvency interest under the present facts, such an award was error, there being no facts in evidence which would require the court to deviate from the general rule against such an award.

We affirm the district court's judgment as to its finding the standby letters of credit provable under section 194 of the National Bank Act. To the extent that the district court's judgment may be interpreted to allow post-insolvency interest, however, we reverse.

AFFIRMED in part, REVERSED in part.

---

**19.** *Ticonic National Bank v. Sprague,* 303 U.S. 406, 58 S.Ct. 612, 614, 82 L.Ed. 926 (1938); *Pinckney,* 86 F.2d at 543.

**20.** *See, Ticonic,* 58 S.Ct. at 614; *Fash v. First National Bank,* 89 F.2d 110, 112 (10th Cir.1937).