**NASHVILLE LODGING CO.,
et al., Appellants**

v.

**RESOLUTION TRUST CORPORATION,
et al., Appellees.**

No. 94–7020.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 13, 1995.

Decided July 18, 1995.

Rehearing and Suggestion for Rehearing
In Banc Denied Sept. 14, 1995.

239

Gary A. Ahrens, argued the cause for appellants. With him on the briefs were Charles E. Raley and Timothy E. Heffernan.

P. Matthew Sutko, Counsel, Resolution Trust Corp., argued the cause for appellee RTC. With him on the brief were Bruce C.

Taylor, Counsel, RTC; Barbara E. Nicastro, Robert E. Craddock and William E. Long.

Hunter T. Carter, argued the cause for appellees Southeast Real Estate Operating Co., L.P., et al. With him on the brief were Howard B. Possick and Jason S. Palmer.

Before BUCKLEY, WILLIAMS and SENTELLE, Circuit Judges.

STEPHEN F. WILLIAMS, Circuit Judge:

A partnership borrowed money from a thrift to finance the construction of a hotel. Because the loan required the partnership to make a large balloon repayment of principal at the end of the loan's term, the partnership secured a second agreement with the thrift by which it would refinance the balloon payment at then-prevailing interest rates. The thrift went under, and ultimately the Resolution Trust Corporation took control. The RTC repudiated the refinancing agreement and sold the original loan to outside investors. The partnership sued the RTC to recover as damages the amounts paid to secure the refinancing agreement; in addition, it sought a declaratory judgment against the outside investors entitling it to set off these amounts against its obligation to repay the original loan.

The district court granted summary judgment to all defendants on all claims. We reverse the grant of summary judgment in favor of the RTC on the damages claims and remand for further proceedings. We affirm the summary judgment against the partnership on its claims for declaratory relief.

## I. *Background*

In 1983, the predecessor-in-interest to plaintiff Nashville Lodging Company ("Nashville") borrowed $9.5 million from the Savers Federal Savings and Loan Association to finance the construction and operation of a hotel in Tennessee. The transaction was structured so that the borrower had to repay only a portion of the loan over the course of its fifteen-year term; the balance was due in a lump-sum payment at the end of the fifteen years. The parties executed a second agreement, under which the thrift agreed to refinance this lump sum at the loan's maturity at

market interest rates. In consideration for the thrift's obligation to refinance, the borrower agreed to pay fees of about $7000 per month on top of its principal and interest payments for the original loan. Nashville and its predecessors paid the fees regularly through October 1991.

Savers Federal became insolvent and was taken over by the federal government in 1989. The thrift was reorganized and operated under federal conservatorship until the RTC was appointed receiver on September 20, 1991. On October 7 the RTC sent Nashville a letter telling it to make all future loan payments directly to the agency. Nashville responded a week later, on October 15, asking the RTC whether it planned to assume or repudiate the companion refinancing agreement. Nashville paid no refinancing fees while it awaited the RTC's response.

The RTC did not reply until December 19, 1991, when it repudiated the refinancing agreement. In February 1992 Nashville filed an administrative claim for damages, seeking a return of all of the fees paid under the refinancing agreement and pre-judgment interest. The RTC denied the claim three months later. In the meanwhile, the RTC sold Nashville's loan to the Southeast Real Estate Operating Company ("SREOC") as part of a larger portfolio of mortgage loans.

In July 1992 Nashville and its general partners filed suit in federal district court against the RTC, SREOC, and SREOC's shareholders. Nashville sought "direct compensatory damages" against the RTC in an amount equivalent to all of the payments made under the repudiated refinancing agreement since 1983. Complaint at 7. It also sought a declaratory judgment stating that it had the rights to recoup and set off these damages against the amount it owed on the original loan. *Id.* at 8–9.

The district court granted summary judgment to all defendants on all counts of the complaint. *Nashville Lodging Co. v. RTC,* 839 F.Supp. 58 (D.D.C.1993). It held first that Nashville was not entitled to any relief against the RTC because it had been in default under the refinancing agreement at the time the agency repudiated the contract:

Nashville had materially breached the agreement by failing to pay the required refinancing fees in November and December 1991. *Id.* at 61–62. Even if the company had not been in default, the court further held, it would still be barred from recovering damages because its rights under the refinancing agreement had not yet "vested" when the RTC became the thrift's receiver: Nashville could not have had "an unqualified right to expect performance of the refinancing agreement on the date that [the receiver] was appointed" because it had not yet made the full fifteen years' payments of refinancing fees. *Id.* at 62. Finally, the district court held that Nashville possessed no rights of recoupment or setoff against SREOC because the purchasers of assets from a failed thrift do not become liable for the thrift's conduct unless that liability is expressly transferred and assumed. *Id.*

Nashville appealed. We reverse the judgment in favor of the RTC on Nashville's claim to damages, disagreeing with both the district court's grounds, but we affirm the denial of a declaratory judgment.

## II. *The Repudiation and Nashville's Claim for Damages*

■ The Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") gives the receivers of failed savings and loan institutions wide-ranging powers to consolidate and liquidate those institutions. Receivers have broad authority under FIRREA to repudiate any contract or lease "(A) to which such institution is a party; (B) the performance of which the ... receiver, in [its] discretion, determines to be burdensome; and (C) the disaffirmance or repudiation of which the ... receiver determines, in [its] discretion, will promote the orderly administration of the institution's affairs." 12 U.S.C. § 1821(e)(1). The receiver is liable to the non-breaching parties to these contracts for damages resulting from its repudiation; however, in the interest of maximizing the number of creditors who can recover some portion of what they are owed, see *DPJ Co. Ltd. Partnership v. FDIC*, 30 F.3d 247, 248 (1st Cir.1994), the receiver's liability on an individual contract is limited to "actual direct compensatory damages," 12 U.S.C. § 1821(e)(3)(A), and is subject to other qualifications.

The RTC makes three arguments in support of the district court's grant of summary judgment in its favor on the claim for damages. The first two, variations on the district court's conclusions, are that Nashville was in default under the refinancing agreement when the RTC repudiated it and hence was disabled from recovering damages for the agency's breach, and that Nashville's claims were not provable and vested at the time of the repudiation. Finally, it argues that the monetary relief sought by the plaintiffs—restitution of the amounts already paid under the refinancing agreement—does not qualify as "actual direct compensatory damages" permitted by § 1821(e)(3)(A). We address each argument in turn.

### A. *Nashville's Default*

■ Nashville's last payment of refinancing fees was the installment due on October 1, 1991; it did not pay the fees for the two months between then and the RTC's December 19 repudiation of the refinancing agreement. The RTC contends that Nashville's failure to make the November and December payments constituted a material breach of the agreement, one sufficient to bar its claim for damages. In response, Nashville denies that it was in default: the company claims that it had simply exercised its right under Tennessee law, which the Refinancing Agreement explicitly selected as governing law, to suspend its performance of the agreement pending adequate assurances from the RTC that the agency would uphold its end of the bargain.

Tennessee case law on the subject is sparse, but what exists suggests that Tennessee adheres to the view that a party to an agreement who has reason to fear that his counterpart may fail to perform may demand assurances that performance will be forthcoming and may, without breaching, suspend his own performance until those assurances are received. In a dictum in *Harlan v. Hardaway*, 796 S.W.2d 953, 958 (Tenn.App. 1990), the court said that a condominium purchaser who feared breach by the develop-

er should have demanded assurances of the developer's future performance rather than repudiating the purchase agreement, citing the *Restatement (Second) of Contracts*. The relevant sections of the *Restatement* read as follows:

§ 251. When a Failure to Give Assurance May Be Treated as a Repudiation.

(1) Where reasonable grounds arise to believe that the obligor will commit a breach by non-performance that would of itself give the obligee a claim for damages for total breach ..., the obligee may demand adequate assurance of due performance and may, if reasonable, suspend any performance for which he has not already received the agreed exchange until he receives such assurance.

. . . .

§ 252. Effect of Insolvency

(1) Where the obligor's insolvency gives the obligee reasonable grounds to believe that the obligor will commit a breach [as above], the obligee may suspend any performance for which he has not already received the agreed exchange until he receives assurance in the form of performance itself, an offer of performance, or adequate security.

■ Under the *Restatement*, if the obligor fails to give adequate assurances of his performance within a reasonable time, the obligee may treat that failure as a repudiation of the contract. *Id.* at § 251(2). The principle seems entirely sensible and one that Tennessee would likely turn from dictum to holding if the occasion presented itself. Cf. *C.L. Maddox, Inc. v. Coalfield Svcs., Inc.*, 51 F.3d 76, 81 (7th Cir.1995) (concluding, even in the absence of case support, that Illinois would apply § 251 on the ground that its principle was sound).

If these principles apply in the present case, Nashville was not in material breach of the refinancing agreement on the date the RTC repudiated. The company's October 15, 1991 letter, asking the RTC whether it was "assuming this obligation," is fairly read as a demand for adequate assurances from the agency that it would honor the refinancing agreement; the RTC's appointment as receiver, combined with its failure by the mid-

dle of October to assume the refinancing contract explicitly as it had the underlying loan, gave Nashville reasonable grounds to believe that the agency would not perform. Moreover, the company had not yet received "the agreed exchange" for its own performance, i.e., the refinancing of the balloon payment that would come at the end of the loan's fifteen-year term. Under the common law as we believe the courts of Tennessee would understand it, Nashville was entitled to suspend its own performance while it awaited adequate assurances that the agency would perform on the contract—in effect, a final decision from the RTC that it would not repudiate the refinancing agreement.

■ The RTC's response is that Tennessee law does *not* govern—that the ordinary doctrines of contract law are swept aside by FIRREA. While courts have issued general pronouncements that FIRREA is "the most sweeping thrift reform law in the nation's history," *Praxis Properties, Inc. v. Colonial Sav. Bank*, 947 F.2d 49, 62 (3d Cir.1991), and that its repudiation mechanism "supersedes—or preempts—volumes of state law," *RTC v. Diamond*, 45 F.3d 665, 671 (2d Cir. 1995), no court has ever suggested that FIRREA totally obliterates state contract law as it applies to any and all agreements with institutions that have been brought under a federal receiver's wing. Cf. *O'Melveny & Myers v. FDIC*, —— U.S. ——, —— – ——, 114 S.Ct. 2048, 2052–53, 129 L.Ed.2d 67 (1994) (describing as "plainly wrong" the contention that FIRREA and federal common law wholly supplant state doctrines of agency). Rather, FIRREA displaces state law with federal rules of decision only where there is "an explicit federal statutory provision," *id.* at ——, 114 S.Ct. at 2054, or in those "few and restricted" cases where there is a "significant conflict between some federal policy or interest and the use of state law," *id.* at ——, 114 S.Ct. at 2055 (quoting *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966); *Wheeldin v. Wheeler*, 373 U.S. 647, 651, 83 S.Ct. 1441, 1445, 10 L.Ed.2d 605 (1963)).

The RTC argues that common-law rights of suspension are specifically preempted by 12 U.S.C. § 1821(e)(12), which gives the receiver the authority to "enforce any contract ... entered into by the depository institution notwithstanding any provision of the contract providing for termination, default, acceleration, or exercise of rights upon ... insolvency or the appointment of a conservator or receiver." The RTC says that the suspension of performance pending adequate assurances constitutes the sort of "exercise of rights" that is preempted by this section of FIRREA. But this argument ignores the explicit text of the statute. Section 1821(e)(12) states only that the receiver's power to enforce contracts exists "notwithstanding *any provision of the contract*" purporting to alter the parties' rights upon insolvency or federal takeover. Nashville asserts a right to suspend performance and demand adequate assurances based on general contract law, however; it does not invoke any provision of the refinancing contract at all. Its right therefore falls outside the specific preemption of § 1821(e)(12).

The RTC's fallback position is that the recognition of state-law rights to suspend performance would generally interfere with the RTC's power to "collect all obligations and money due the institution," 12 U.S.C. § 1821(d)(2)(B)(ii), and its ability to "promote the orderly administration of the institution's affairs"—the explicit goal of FIRREA's repudiation mechanism, *id.* at § 1821(e)(1)(C). The Second Circuit found such a conflict in *RTC v. Diamond*, 45 F.3d at 674–75, holding that the RTC's power to repudiate leases trumps state rent-control regulations that protect a tenant for a term of years from eviction so long as the tenant pays the rent. But the state-law rights in question in the present case do not *conflict* with the federal statute—they merely allow those affected by the RTC's broad powers to accommodate themselves to the 800–pound gorilla's appearance on the block. The RTC suggests that the right to suspend performance, if preserved, would allow all contractors with an insolvent institution to repudiate their contracts unilaterally once a receiver was appointed, but this is not how suspension operates. As soon as the nonsuspending party timely delivers adequate assurances of performance (in our context, when the RTC communicates its final decision not to repudiate the contract), the suspension doctrine allows that party to "collect all obligations and money" that came due during the period of suspension, consistently with the mandate of § 1821(d)(2)(B)(ii). See also *Harlan v. Hardaway*, 796 S.W.2d at 958 (contrasting suspension with anticipatory repudiation). The RTC's fear that it will be stampeded into making premature repudiation decisions is likewise misplaced: the "reasonable time" within which it must give assurances lest the obligee be entitled to treat the contract as repudiated, *Rest. (2d) of Contracts* § 251(2), would necessarily be construed congruently with the RTC's existing obligation under FIRREA to exercise its repudiation rights within a "reasonable period following [the receiver's] appointment," 12 U.S.C. § 1821(e)(2). Hence, the operation of the common-law suspension right would not interfere with the receiver's ability to repudiate or affirm contracts, the timing of its decisions, or its ability to collect on whatever contracts it ultimately chooses to enforce.

In fact, the only aspect of the RTC's work that *would* be affected by the operation of these state-law rights is the agency's ability to collect, on agreements it ultimately decides to repudiate, contract payments due in the period between the appointment of the receiver and the final decision to repudiate. And here the effect is only to prevent FIRREA's repudiation scheme from bringing about what is at best an anomaly, at worst a stark injustice. As noted above, the nonbreaching party to a repudiated contract may recover damages resulting from the repudiation; for most contracts,[1] however, FIRREA specifies that the receiver's liability is "determined as of ... the date of [its] appointment," not the date of the actual repudiation, 12 U.S.C. § 1821(e)(3)(A)(ii). Although we do not decide the question, this could have

---

1. FIRREA specifies different methods of calculating the receiver's liability for leases, contracts to sell real estate, and certain classes of financial contracts not at issue here. See 12 U.S.C. § 1821(e)(3)(C) and (e)(4) to (e)(6).

the effect of making damages incurred in the period between the appointment of the receiver and the repudiation unrecoverable. If a contractor who correctly believed that the RTC planned to repudiate his agreement could not suspend performance, he would be obligated to perform on the contract—in effect, to throw good money after bad—for however long it took the RTC to make its final decision, lest he be in breach once the agency actually repudiated. Yet § 1821(e)(3)(A)(ii) may well deny him any recovery of these additional payments. Suspension saves contractors from having to pour money down a black hole.

In sum, we hold that Nashville properly exercised its rights under Tennessee law to suspend its payments of monthly fees while awaiting the RTC's final decision on the refinancing agreement. The company was therefore not in breach at the moment of repudiation, and its claim for damages cannot be denied on these grounds. We have no need to consider Nashville's alternative theories by which its seeming breach could be excused.

B. *"Vesting" and "Provability"*

■ Pre–FIRREA banking law held that claims against the receivers of insolvent national banks were recoverable only if they were provable and vested—that is, "the liability of the bank ... accrued and bec[a]me unconditionally fixed on or before the time it [was] declared insolvent." *Kennedy v. Boston–Continental Nat'l Bank,* 84 F.2d 592, 597 (1936). SREOC and the RTC assert that this requirement survives the adoption of FIRREA and applies to claims arising out of the receiver's repudiation of an insolvent thrift's contracts. They argue that Nashville's claims fail to meet this requirement because on the date the RTC became receiver, Nashville's rights under the refinancing agreement were contingent rather than "accrued and ... unconditionally fixed": the company would only receive the refinancing if (1) it made the monthly payments of refinancing fees for the remaining term of the underlying loan, (2) it paid the thrift's normal loan fees and submitted all the applications and documentation required for the refinanc-

ing, and (3) its application, insurance, and financial papers were all in order. In the RTC's words, these contingencies left Nashville with a mere "right to apply to Savers Savings for a new loan at 'market rate' in 1998," a right that had no fixed or recoverable value when the RTC became receiver in September 1991.

The idea that an obligation must have become absolute by the time of insolvency had clearly weakened even before FIRREA's adoption, however, and it plainly has not survived the statute's specification of claims recoverable upon repudiation in 12 U.S.C. § 1821(e)(3). Even in a pre-FIRREA insolvency, for example, creditors could recover for a receiver's breach of a "standby" (and thus contingent) letter of credit. See *Citizens State Bank v. FDIC,* 946 F.2d 408 (5th Cir.1991). We followed *Citizens State Bank* in applying FIRREA in *Office and Professional Employees Int'l Union, Local 2 v. FDIC,* 27 F.3d 598 (D.C.Cir.1994), where we found that dismissed employees of an insolvent bank could recover severance benefits promised under their repudiated collective bargaining agreement even though they had not been fired when the receiver was appointed and had only contingent rights to the benefits at that time. To show that the claim had "accrued," it was enough that if the bank had remained solvent and had unilaterally repudiated the severance obligations, the employees could have sued successfully in court for the value of those benefits. The contingencies surrounding the right (events that might have terminated a worker's employment without triggering severance liability) went only to the present value of the right to the benefits as of the date the receiver took over, not to the right's existence on that date. *Id.* at 601–02. In short, the question of whether the employees' rights were sufficiently vested on the relevant date (and their claims sufficiently provable) turned on whether the insolvent bank's promise was "binding and enforceable under contract law" at that time. *Id.* at 602.

■ Nashville's claims meet this standard. Tennessee courts have long held that a party may sue and recover damages from a bank that breaches a contract to make a loan.

See, e.g., *Farabee–Treadwell Co. v. Union & Planters' Bank & Trust Co.*, 135 Tenn. (8 Thompson) 208, 186 S.W. 92 (1916). The fact that Nashville had not at the time of repudiation paid the full fifteen years' worth of refinancing fees is irrelevant: it is well settled at common law that even a party who has not yet *begun* to satisfy his duties under a contract may sue for anticipatory breach when the other party unequivocally announces his intent not to perform. See, e.g., *Roehm v. Horst*, 178 U.S. 1, 20 S.Ct. 780, 44 L.Ed. 953 (1900) (collecting cases). Finally, no matter how contingent Nashville's eventual right to refinance may have been (and the defendants overstate the contingency when they characterize it as a mere right to file a loan application: businessmen do not normally pay $7000 a month for the privilege of doing what they could have done *without* express permission), the RTC has offered no reason to believe the right had *no* positive present value in December 1991. The burden is on RTC as repudiator to show that the value of the right Nashville bought was worth less than what it had paid as of October 1991. See Charles T. McCormick, *Handbook on the Law of Damages* § 142 at 584 and n. 8 (1935) (courts presume that a breached contract would have benefited the non-breaching party by at least as much as that party was willing to lay out to secure its performance; breaching party must prove otherwise). We therefore reject the RTC's arguments that Nashville's claim for damages must fail for lack of provability or vestedness.

### C. *"Actual Direct Compensatory Damages"*

■ FIRREA explicitly limits a receiver's liability on a repudiated contract to "actual direct compensatory damages," 12 U.S.C. § 1821(e)(3)(A)(i). The statute does not define this term expressly; in its next section, however, FIRREA does exclude a number of items, explaining that "the term 'actual direct compensatory damages' does not include—(i) punitive or exemplary damages; (ii) damages for lost profits or opportunity; or (iii) damages for pain and suffering," *Id.* at § 1821(e)(3)(B).

Nashville's complaint sought what it termed "direct compensatory damages" in an amount equivalent to the monthly fees that it and its predecessors-in-interest had paid under the repudiated agreement. The RTC contends that Nashville is in effect seeking the remedy of *restitution*, which it says falls outside the scope of "actual direct compensatory damages." (The RTC makes no claim that the proposed remedy falls within any of the specific exclusions of § 1821(e)(3)(B).) The distinction (it argues) is that damages are a forward-looking remedy, the purpose of which is "to put the party in as good a position as he would have been had the contract been completed," while restitution looks backwards and attempts to "restore[ ] the injured party to the position he occupied prior to the contract being made."

■ We grant that the remedy Nashville requested for its injuries is calculated retrospectively rather than prospectively, but we do not agree that this renders it non-compensatory. It is true that the ordinary measure of damages for breach of contract is forward-looking and seeks to protect the non-breaching party's "expectation interest": the plaintiff in such a case is given the "the value of the expectancy which the [breached] promise created," just as if the contract had gone through to completion. L.L. Fuller & William R. Perdue, Jr., The Reliance Interest in Contract Damages (Part 1), 46 Yale L.J. 52, 54 (1936); see also *Rest. (2d) of Contracts* § 344(a). But where the prospective, "benefit of the bargain" damages prove too difficult or speculative to calculate, courts commonly give the plaintiff damages measured retrospectively, protecting the plaintiff's "reliance interest" by "undoing the harm which his reliance on the defendant's promise has caused him" and "put[ting] him in as good a position as he was in before the promise was made." Fuller & Perdue at 54; see also *Rest. (2d) of Contracts* § 344(b). This back-up remedy gives the plaintiff "the repayment of his expenditures in preparing to perform and in part performance." McCormick, *Damages* § 142 at 583; see also *United States v. Behan*, 110 U.S. 338, 344–45, 4 S.Ct. 81, 83–84, 28 L.Ed. 168 (1884) (non-breaching party may always recover "his loss of actual

outlay and expense," even if lost profits are incapable of proof).

The fact that reliance damages are backward-looking does not destroy their pedigree as a species of compensatory relief. McCormick emphasizes that

This recovery is strictly upon the contract. True, it is not measured according to the principle that the contracting party should be placed in the condition he would be in if the contract had been performed, but is more analogous to the classical measure of 'out-of-pocket' loss.... It does, however, conform to the more general aim of awarding compensation in all cases, and departs from the standard of value of performance only because of the difficulty in applying it.

*Damages*, § 142 at 583–84. For this reason, remedies calibrated to putting the claimant back in the position he occupied before making the repudiated agreement are "actual direct compensatory damages" no less than those aimed to put him where he would have been if the contract had been fulfilled. Both are presumptively recoverable under FIRREA. See *DPJ Co. v. FDIC*, 30 F.3d at 249–50 (holding that claims for "reliance damages" are not barred by FIRREA).

Although all the parties have, in their briefs, referred to Nashville's claim as one for "restitution"—which implies that the company is seeking to force the RTC to disgorge a specific benefit conferred on it, thereby avoiding the agency's unjust enrichment, see *Rest. (2d) of Contracts* § 344 cmt. a—we need not consider whether relief that is solely restitutionary could be recovered under FIRREA. Nashville is seeking compensation for the out-of-pocket expenses (or at least the portion paid as refinancing fees) that the company incurred in reliance on the thrift's original promise to refinance its loan at the end of the fifteen-year term. Such payments qualify as reliance damages. *DPJ Co. v. FDIC*, 30 F.3d at 248–50 (holding that commitment fees paid to an insolvent bank to secure a line of credit were recoverable under FIRREA as reliance damages once receiver repudiated loan); *Hidalgo Properties, Inc. v. Wachovia Mortgage Co.*, 617 F.2d 196, 198–99 (10th Cir.1980) (allowing plaintiff in ordinary breach-of-contract suit to recover fees paid to defendant lender to secure a repudiated standby loan commitment and characterizing these fees as "expenses incurred by [plaintiff] in performing the contract," the epitome of reliance damages). Nashville's complaint correctly characterized its claim for these expenses as one for "direct compensatory damages." The company's bid to recover them does not run afoul of FIRREA's limitation to compensatory damages.

The district court thus erred in granting the RTC summary judgment on Nashville's claims for damages. We vacate the judgment in RTC's favor and remand the claims for further proceedings.

### III. *Claims for Declaratory Judgment*

Nashville's complaint also asked for a declaration that the company was entitled to recoup and set off its damages under the repudiated refinancing agreements against its future obligations under the original loan. Although Nashville asked for a declaratory judgment against *all* defendants, its rights against the RTC do not fit the concepts of recoupment or setoff. Both are procedural devices by which a defendant seeks to reduce the amount he owes to a plaintiff by the value of the plaintiff's cross-obligations to the defendant. They differ in that recoupment involves the balancing of reciprocal obligations incurred as part of a single transaction, while setoff refers to the balancing of obligations that the parties incurred in wholly separate transactions. See, e.g., *United Structures v. G.R.G. Engineering*, 9 F.3d 996, 998–99 (1st Cir.1993). Clearly, a party can have recoupment and setoff rights only against one asserting claims against himself. As the RTC has sold Nashville's loan, it can no longer have any claim on that contract against the company, and no one suggests that it has any other claims up its sleeve. Recoupment and setoff therefore have no place in the two parties' relationship; the declaratory relief that Nashville sought against the agency is moot and was properly denied.

Recoupment and setoff might, of course, come into play as between Nashville and SREOC, the current holder of the loan.

But we agree with the district court that SREOC did not become affirmatively liable for the RTC's repudiation of the refinancing agreement simply by purchasing the underlying loan. FIRREA empowers the RTC to organize thrift institutions to "take over such assets or such liabilities as [the RTC] may determine to be appropriate." 12 U.S.C. § 1821(d)(2)(F)(i). The courts have read this as showing that the statute more generally "contemplates that RTC will determine which assets and liabilities of a failed thrift should be sold and transferred, and which it should keep." *Payne v. Security Sav. & Loan Ass'n*, 924 F.2d 109, 111 (7th Cir.1991); see also *First Indiana Fed. Sav. Bank v. FDIC*, 964 F.2d 503, 506–07 (5th Cir.1992). The rule enhances the receiver's ability to wind up the affairs of insolvent institutions expeditiously and at minimal public expense "by allowing the RTC to absorb liabilities itself and guarantee potential purchasers that the assets they buy are not encumbered by additional financial obligations." *Payne*, 924 F.2d at 111. Although (as Nashville correctly notes) this rule is most frequently applied in the context of large-scale purchase and assumption agreements—in which the receiver agrees to sell substantially all of the assets of a failed institution to a solvent one in a single transaction—the principle has nothing to do with the scale of the transaction and is equally applicable to contracts to transfer smaller subsets of the insolvent institution's assets, such as the RTC's agreement in the present case to sell SREOC the portfolio of loans of which Nashville's was a part.

■ This rule, allowing the RTC in effect to split what would have been a borrower's counterclaims against the insolvent institution from claims that it could have brought against the borrower, applies even when the original claim and the counterclaims arise out of related agreements. In *FSLIC v. Mackie*, 962 F.2d 1144 (5th Cir.1992), plaintiff Mackie received a construction loan from Lamar Federal Savings; at the same time, Mackie and Lamar entered into a supplemental permanent loan commitment. Mackie defaulted, and Lamar sued to foreclose on the loan. Mackie filed counterclaims on several theories, including a contention that Lamar had breached the loan commitment agreement. *Id.* at 1146. During the litigation, Lamar went into federal receivership, and the receiver transferred all of Lamar's assets to a solvent institution, Southwest Savings Association; Southwest continued the suit against Mackie for default on the construction loan and ultimately won. On appeal, the Fifth Circuit held that "Mackie [could not] bring any counterclaims or claims for offset against Southwest because Southwest did not assume any of the [receiver's] liabilities; it only purchased the assets." *Id.* at 1150.

■ In the present case, the parties do not dispute the fact that SREOC bought Nashville's loan without expressly assuming the RTC's liability to the company for repudiating the refinancing agreement. The situation therefore seems analogous to *Mackie*, and we find that a similar rule should apply. Nashville cannot counterclaim against SREOC to recoup or set off its damages from the repudiation against its remaining obligations on its loan; the company may recover these amounts only from the RTC in its primary claim for damages.

The *Mackie* court suggested that the same theories and factual circumstances underlying a borrower's forbidden counterclaims against the purchaser of an insolvent institution's loans might nonetheless be raised as affirmative defenses against the purchaser's suit to enforce the loan obligation. *Id.* at 1150. Although the request for relief in Nashville's brief occasionally slips from a declaration on available counterclaims to one on available defenses, we need not here consider the possibility of recasting Nashville's counterclaim theories as defenses. We addressed the company's potential counterclaims against SREOC because, without much alteration, they might well have been brought (equally unsuccessfully, we might add) as stand-alone affirmative actions in parallel with the damages claims against the RTC. But it would require too much speculation on our part for us to make pronouncements on the availability of potential defenses in hypothetical litigation that the plaintiff has not even suggested it contemplates precipitating, especially where the specific con-

text of the litigation might bear critically on the validity of any potential defense. See *Public Svc. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 244, 73 S.Ct. 236, 240–41, 97 L.Ed. 291 (1952) (for request for declaratory relief to be ripe, the would-be litigants' dispute "must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them"). We therefore affirm the district court's denial of declaratory relief against both defendants.

*　　*　　*

The district court's denial of declaratory relief is affirmed for the reasons stated above; the grant of summary judgment in favor of the RTC on Nashville's claim for damages is reversed and the case is remanded to the district court for further proceedings.

*So ordered.*