**NASHVILLE LODGING CO.,
et al., Plaintiffs,**

**v.**

**FEDERAL DEPOSIT INSURANCE COR-
PORATION, as Receiver for Savers
Savings Association, Defendant.[1]**

**Civil Action No. 92–1615.**

United States District Court,
District of Columbia.

July 31, 1996.

---

1. The Federal Deposit Insurance Corporation ("FDIC") statutorily succeeded the Resolution Trust Corporation as Receiver for Savers Savings on January 1, 1996. *See* 12 U.S.C. 1441a(m)(1) (1994); Notice of Filing, *Nashville Lodging Corp. v. Resolution Trust Corp.*, Civ. No. 92–1615 (D.D.C. December 13, 1995).

Charles E. Raley, Watt, Tieder & Hoffar, McLean, VA, for plaintiffs.

Barbara E. Nicastro, Bethel & Nicastro, Washington, DC, for defendant.

Hunter T. Carter, Howard B. Possick, Sharon M. Shroer, Washington, DC, for Southeast Real Estate Company.

## OPINION

STANLEY S. HARRIS, District Judge.

Before the Court are plaintiffs' motion for summary judgment; defendant's opposition thereto; defendant's cross-motion for partial summary judgment; plaintiffs' reply to defendant's opposition; plaintiffs' response to defendant's statement of points and authorities in support of its motion for partial summary judgment; and defendant's reply to plaintiffs' response. Upon careful consideration of the filings and the entire record, plaintiffs' motion for summary judgment is granted in great part and denied in part, and defendant's motion for partial summary judgment is denied. Although "[f]indings of fact and conclusions of law are unnecessary on decisions of motions under Rule 12 or 56," Fed.R.Civ.P. 52(a), the Court nonetheless sets forth its reasoning.

*Background*

The history of this case is fully set out in this Court's Opinion of December 30, 1993, 839 F.Supp. 58 (D.D.C.1993), and the Opinion of the United States Court of Appeals for the District of Columbia Circuit, issued on July 18, 1995, 59 F.3d 236 (D.C.Cir.1995). In

2. Nashville Lodging succeeded 2300 Elm in 1989 as the payor of the Loan and the Refinancing

brief: On July 10, 1992, plaintiff Nashville Lodging Company and two of its general partners, Kenneth E. Nelson and Nashville Residence Corporation ("NRC") (hereinafter collectively termed "Nashville"), filed suit against the Resolution Trust Corporation and the Southeast Real Estate Operating Company ("SREOC"). Nashville claimed that the RTC erroneously denied Nashville's claim for damages stemming from the RTC's repudiation of a Refinancing Agreement. The Refinancing Agreement had been executed in 1983, along with a $9.5 million loan ("Loan"), by Savers Federal, a bank which was reconstituted in 1989 as Savers Savings and which was in RTC receivership by 1991, and a company called 2300 Elm, formerly named the Nashville Residence Corporation ("NRC ('83)," not to be confused with the current "NRC").[2] Nashville also claimed that, since the RTC had sold the Loan to SREOC as part of a pool of loans, Nashville was entitled to offset the damages suffered as a result of the RTC's repudiation of the Refinancing Agreement against the amounts owing to SREOC on the Loan's principal.

In its December 30, 1993, Opinion, this Court held that, since Nashville failed to make two payments to the RTC under the Refinancing Agreement between the time the RTC was appointed Receiver of Savers Savings and the time the RTC repudiated the Refinancing Agreement, Nashville was in default under the Refinancing Agreement at the time of repudiation, and therefore was not entitled to recover damages for the RTC's purported breach of that Agreement. In the alternative, this Court found that, since Nashville's rights under the Agreement had not vested, it was not entitled to recover any "actual direct compensatory damages" under the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA). *Nashville Lodging Co. v. RTC*, 839 F.Supp. 58, 62 (D.D.C.1993); *see also* 12 U.S.C. § 1821(e)(3)(A) (1994) (liability of RTC for repudiation of any contract limited to "actual direct compensatory damages," determined either as of the date of appointment of the receiver or the date of repudiation, depend-

Agreement fees; the effect of its succession, as will be discussed below, is in some dispute.

ing on the nature of the contract repudiated). Finally, this Court held that, since the RTC had transferred only the Loan to SREOC, and not any liability stemming from the RTC's repudiation of the Refinancing Agreement executed along with the Loan, plaintiffs could not offset any damages from the RTC's repudiation of the Agreement against what they owed SREOC on the Loan. 839 F.Supp. at 62.

The Court of Appeals affirmed this Court's Opinion in part and reversed in part. *Nashville Lodging Co. v. Resolution Trust Corp.*, 59 F.3d 236 (D.C.Cir.1995). The Court of Appeals affirmed this Court's holding that Nashville was not entitled to offset against what it owed SREOC on the Loan any damages from the repudiation of the Agreement. The Court of Appeals held, however, that Nashville had not been in default under the Agreement at the time of repudiation, but had merely withheld payment of the monthly fees pending adequate assurances from the RTC that the Agreement would be assumed and not repudiated. 59 F.3d at 241–44.

In addition, the Court of Appeals held that, although Nashville's right to refinancing at the end of the term of the Loan was contingent upon Nashville's continued compliance with the Agreement (*inter alia*, continued timely payment of the monthly fees), the promise of the bank to refinance was "binding and enforceable under contract law" at the time of the repudiation. 59 F.3d at 241–42 (quoting *Office and Professional Employees Int'l Union v. FDIC*, 27 F.3d 598, 602 (D.C.Cir.1994)). The Court of Appeals likewise held that the compensation Nashville sought from the RTC was properly thought of as "actual direct compensatory damages" under FIRREA, and stated that, with respect to proof of damages, the "burden is on the RTC as repudiator to show that the value of the right Nashville bought was worth less than what it had paid as of October 1991." *Id.* at 245–46. *See also DPJ Co. v. FDIC*, 30 F.3d 247, 250 (1st Cir.1994) (holding that loan commitment fees outlaid as condition of securing a line of credit with bank were "actual direct compensatory damages" under FIRREA).

The Court of Appeals accordingly remanded the case to this Court for further proceedings on Nashville's damage claims, stating that Nashville's "bid to recover [its expenses paid as refinancing fees] does not run afoul of FIRREA's limitation to compensatory damages." *Id.* at 246. The Court of Appeals denied the RTC's petition for rehearing and suggestion for rehearing *en banc* on September 14, 1995. After the mandate from the Court of Appeals issued in late October 1995, this Court issued an Order requesting the parties to file a Status Report and proposed briefing schedule on the damages issue; following an additional period of discovery, the parties filed the above-referenced cross-motions and accompanying memoranda.

*Discussion*

 Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a summary judgment motion, all evidence and the inferences to be drawn from it must be considered in a light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994). Summary judgment cannot be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* (emphasis in original).

A fundamental disagreement apparently exists between Nashville and defendant as to what exactly the Court of Appeals held in its June 1995 opinion. Nashville contends in its motion for summary judgment that the Court of Appeals determined that Nashville was entitled to some damages, the only question

being how much. The FDIC contends that the Court of Appeals' opinion is merely a jumping-off point for discussion about how much, if any, damages plaintiff should receive.

Defendant's perception is the better of the two. The Court of Appeals held that Nashville's suspension of payments did not constitute a breach, "reject[ed] the RTC's arguments that Nashville's claim for damages must fail for lack of provability or vestedness," and pronounced that plaintiffs' "bid to recover" its expenses paid under the Refinancing Agreement did not "run afoul of FIRREA's limitation to compensatory damages." 59 F.3d at 244–46. These three holdings, in the aggregate, address only threshold issues to the ultimate damage determination; nothing in the Court of Appeals' opinion assures plaintiffs of full, or even partial, recovery on their claim.

■ That being said, defendant's arguments against recovery on plaintiffs' claims suffer from a number of failings. First, defendant is estopped from asserting that Nashville Lodging is not the successor-in-interest to NRC ('83). Second, defendant's contention that the Refinancing Agreement was a valueless sham transaction at its incipience is without merit. Third, defendant's lack of any proof rising above the level of speculation that the present value of the Refinancing Agreement is worth less than the amount Nashville has previously paid dictates judgment in favor of the plaintiffs for the full amount of the fees paid under the Refinancing Agreement, dating to its execution in 1984. However, because the Court

finds that the Refinancing Agreement is not a "qualified financial contract" under FIRREA, Nashville is only entitled to damages dating from the date of appointment of the receiver, not as of the date of repudiation.[3] Nashville is entitled as well to prejudgment interest on its claim.

### A. *Nashville Lodging As Successor–In–Interest To NRC ('83)*

■ In 1993, this Court wrote in its Opinion that NLC was "substituted as the borrower of the [L]oan in 1989," after NRC ('83) had "transferred the property to [NLC]." 839 F.Supp. at 60. In 1995, the Court of Appeals wrote in its Opinion that NRC was "the predecessor-in-interest" to NLC. 59 F.3d at 240. Now, after the case has been remanded to this Court for a determination of damages, defendant brings to the forefront an issue it previously dealt with only in a footnote in its 1993 opposition to plaintiff's motion for summary judgment.[4] Namely, it claims that NLC was not the successor-in-interest to NRC ('83) such that it is entitled to collect as damages fees paid prior to April 1989, and that NLC's claim for damages must be limited to payments made after that month.

On April 24, 1989, approximately six years after the execution of the Loan and the Refinancing Agreement, Nashville Lodging, Savers, and a third company, Metric Partners Growth Suite Investors ("Metric"), entered into a "Three Party Agreement." Pls.' [1993] Mot. for Summ.J., Aff. of Kenneth E. Nelson (hereinafter "1993 Nelson Aff."), Ex. N. The purpose of the Three Party Agree-

---

3. Damages will, of course, be reduced to the pro rata percentage paid on claims allowed by the RTC as Receiver for Savers Savings, which plaintiffs represent to be 2.25%. Pls.' Reply at 12. *See* 12 U.S.C. § 1821(i)(2) (maximum liability of the RTC to a claimant equals the amount the claimant would have obtained if the RTC had liquidated the institution); *see also Resolution Trust Corp. v. Cheshire Management Co.*, 18 F.3d 330 (6th Cir.1994) (same).

4. *See* Def.'s Statement of Points and Authorities in Opp. to Pls.' [1993] Mot. for Summ.J., at 1 n. 1 ("There is ... possibly, a dispute of fact as to what entity paid the refinance fees.") *See also* Def.'s Statement of Disputed Facts, paras. 3 ("the identity of the payor of each payment re-

main[s] a disputed issue"), and 4 ("There is nothing in the Three–Party Agreement ... assigning rights under the Refinancing Agreement or the Loan to NLC by NRC (83)"). Defendant pointed out in footnote 1 of its opposition that this dispute only was material "if there is a finding of liability," and, as stated *supra*, the Court of Appeals reversed this Court's finding of no liability. Accordingly, the Court reluctantly concludes that, although defendant preserved this issue for argument only by the narrowest of margins, defendant cannot be found to have waived the issue whether NLC is entitled to all or part of any damages found owing. It is, however, estopped from advancing this argument, for the reasons stated *infra*.

ment was to commemorate a purchase agreement between NLC, NRC ('83), and Metric, whereby NLC agreed to grant to Metric a leasehold interest in land and improvements, and NRC ('83) agreed to sell to Metric certain personal property, at 2300 Elm Hill Pike in Nashville (collectively "the Hotel"). *Id.* at 1–2. A deed of trust encumbering the Hotel was security for the 1983 Loan. *Id.* at 2. NLC was to remain liable for, and make all payments on, the Loan and the Refinancing Agreement. *Ibid.*

 On page 6 of the Three Party Agreement, a section titled "Agreement" contains the following paragraph:

> Savers acknowledges that NRC has conveyed all of its interest in the Hotel (other than a portion of the Personal Property) to NLC and that NLC shall be substituted for NRC each time there is a reference to NRC in the Existing Loan Documents [namely, the Loan, the deed of trust, the Refinancing Agreement, and other ancillary documents], and Savers agrees to look to NLC from and after the date hereof for performance of all the obligations of the borrower under the terms of the Existing Loan Documents. NLC hereby agrees to be bound by the terms of and to perform all of the obligations of the borrower under the Existing Loan Documents.

1993 Nelson Aff., Ex. N, para. 5, pp. 6–7. Defendant now contends that this explicit acknowledgment on the part of Savers Savings was not a valid assignment of NRC ('83)'s interest in the Loan, since NRC ('83) was not a party to the Three Party Agreement.[5]

 The fact that NRC ('83) was not a signatory to the Three Party Agreement is irrelevant, since Savers acknowledged that NLC was to be substituted as the Borrower under the Loan. This is a quintessential example of estoppel. Under the terms of the Loan, NRC ('83) was required to acquire Savers' consent to an assignment of its interest under the Loan. 1993 Nelson Aff., Ex. B, at 15. This it did, via the Three–Party Agreement, and NLC relied on Savers' express acknowledgment for over two years in making monthly payments to Savers under the Loan and the Refinancing Agreement. When the RTC repudiated the Refinancing Agreement, it sent notice only to NLC. *See* 1993 Nelson Aff., Ex. P. When the RTC denied NLC's claim (which claim was submitted on behalf of "NLC and/or 2300 Elm Hill Pike, Inc., f/k/a [NRC ('83)]," *see* 1993 Nelson Aff., Ex. Q), the RTC sent notice only to NLC. *See* 1993 Nelson Aff., Ex. V. Defendant as Receiver for Savers cannot now contest the assignment of interest under the Loan and Refinancing Agreement to NLC, Savers having acknowledged its validity years ago and the RTC having repeatedly indicated its awareness that NLC was the entity performing under the Loan and Refinancing Agreement and to whom performance was owed under both.

**B.** *Amount of Damages Recoverable by NLC*

Defendant also contends, both in its motion for partial summary judgment and in its opposition to plaintiffs' motion for summary judgment, that NLC is only entitled to recover damages dating from April 24, 1989, the date of the Three Party Agreement, to the date of appointment of the RTC as Receiver for Savers Savings, to be further reduced if the Court finds that the present value of the

---

**5.** The Court also notes that NRC ('83)'s President was Kenneth Nelson, who was a signatory to the Three Party Agreement, and who accordingly could be deemed to have assented to the assignment. In addition, the transaction in question—the conveyance of an obligation under the Loan and Refinancing Agreement from NRC ('83) to NLC, in exchange for the contemporaneous conveyance of an interest in the property securing the Loan and Refinancing Agreement—is not truly an assignment, but resembles more a novation. In an assignment, the assignor still, under some circumstances, remains liable to the obligee for performance under the contract. In a novation, the assignee is substituted under the contract in the place of the assignor, essentially substituting a new contract for the old. NRC ('83) apparently no longer exists, and the Three Party Agreement, which references the Purchase Agreement entered into between Metric, NLC, and NRC ('83), makes clear that the transfer of interest from NRC ('83) to NLC under the Loan and Refinancing Agreement was in the form of a novation. *See* 3 Samuel Williston, A Treatise on the Law of Contracts § 418 (3rd Ed.1960 & Supp.1995) (hereinafter "Williston on Contracts"); *id.* at § 1865 (discussing novation).

Refinancing Agreement is worth something less than what NLC paid for it over that two-and-a-half year period. Defendant is incorrect on its first point, and, as will be discussed in Section C *infra*, it likewise fails to prove the second.

■ As mentioned above, NRC ('83) apparently no longer exists. When NLC assumed liability for the payments on the *Loan and Refinancing Agreement*, it stepped into the shoes of NRC ('83) with respect to the entirety of the Loan and Refinancing Agreement. *See* Williston on Contracts § 404 ("[T]he assignee acquires rights similar to those of the assignor, and is put in the same position with reference to those rights as that in which the assignor stood at the time of the assignment"). This includes the right to sue for damages for defendant's repudiation of the Refinancing Agreement, dating from the execution of the Agreement.

Defendant contends that NLC will be privy to a windfall if it is required to pay NLC more in damages than that entity actually paid under the Refinancing Agreement. Defendant ignores the equally obvious fact that, if the Court were to hold that NLC was only entitled to damages dating from April 24, 1989, defendant would enjoy a windfall: namely, it would avoid paying as damages several years' worth of refinancing fees incurred prior to April 1989, simply because the entity that first paid them no longer exists. As between windfalls, and under the law of contracts, the former is far preferred. *Cf.* Williston on Contracts § 431 (under an assignment, assignee gains right to all payments becoming due in the future, even for work done prior to the assignment). When NLC and NRC ('83) bargained for the transfer of interest under the Loan, it can be assumed that NLC gave to NRC ('83) a certain amount of consideration to succeed NRC ('83)'s interest in the property securing the Loan—in fact, that consideration took the form of assuming the obligation under the Loan and Refinancing Agreement. Part of that consideration represents NLC's assump-

tion not only of NRC ('83)'s obligations under the Loan and Refinancing Agreement, but also of the possibility of breach by defendant such that NLC would be in a position to collect damages both from its contributions and from those of the now-defunct NRC ('83).[6] Accordingly, the Court holds that NLC is entitled to claim as damages all payments made under the Refinancing Agreement, both by it and by its predecessor entity.

### C. *Value of the Refinancing Agreement*

In its Opinion remanding this case to this Court for a damages determination, the Court of Appeals held that, with respect to the amount of damages claimed by Nashville, "[t]he burden is on RTC as repudiator to show that the value of the right Nashville bought was worth less than what it had paid as of October 1991." 59 F.3d at 245 (citing Charles T. McCormick, Handbook on the Law of Damages § 142 at 584 and n. 8 (1935)).

Despite this pronouncement, the FDIC argues in its opposition to plaintiffs' motion for summary judgment that "NLC has yet to articulate any benefit to it of the 'refinancing commitment.'" Def.'s Opp. to Pls.' Mot. for Summ.J., at 10. Plaintiffs need not show anything at all under the rubric set out by the Court of Appeals; rather, it is up to the FDIC to show that the value of the right to refinancing was worth less than the refinancing fees it had paid as of the time the RTC was appointed Receiver. This it has not done.

The FDIC argues in its opposition that the Refinancing Agreement was merely a sham, an "artifice" amounting only to an "illusory promise" to refinance the Loan. Defendant argues that various bond attorneys, bank officials, and the like had contrived to make an end-run around the requirement that the interest rate on the Loan be lower than a certain percentage, in order for the bank to continue to treat certain industrial revenue

---

**6.** Indeed, another question is raised by defendant's contention that NRC ('83), and not NLC, is the only entity able to claim damages from the RTC's repudiation of the Refinancing Agreement prior to the Three Party Agreement: since the bank (and the RTC, as its Receiver) no longer had a continuing obligation to NRC ('83) as of 1989, how would NRC ('83) be able to step in two-and-a-half years later and make a claim for damages?

bonds (the proceeds of which had been deposited with Savers and essentially had financed the Loan) as tax-exempt. Def.'s Opp. at 7–11. The contrivance, according to defendant, took the form of the Refinancing Agreement, which increased Savers' "profit" without increasing the interest rate of the Loan and jeopardizing the bonds' tax-exempt status. This argument, it must be noted, has never before been raised, either in this Court or in the Court of Appeals.

■ Defendant's best efforts to expose the "real purpose" of the Refinancing Agreement and to debunk its value amount, at best, to well-crafted speculation. Defendant's assertions that the Refinancing Agreement conferred "no benefit" to NLC ignore the benefit apparent from the face of the document: the Refinancing Agreement provides that "Savers agrees to refinance, or cause to be refinanced[,] the Loan at its maturity. . . ." App. to [Appellate] Br. of Plaintiffs–Appellants (submitted to this Court June 7, 1996), Ex. X. The "benefit" conferred on NLC, of course, is certainty: by procuring an assurance that Savers "agree[d] to refinance, or cause to be refinanced" the Loan, NLC locked in a refinancing commitment. Even defendant concedes that NLC's success at obtaining a similar refinancing commitment in the absence of an agreement would be contingent on various occurrences, Def.'s Opp. at 7; locking in a refinancing commitment removed some of those contingencies, which undoubtedly benefits NLC. Defendant ignores this obvious benefit, instead putting forth a new conspiracy theory utterly lacking in evidentiary support.

■ Defendant also contends that, even if the Refinancing Agreement could be viewed as conferring a future benefit on NLC, NLC received "substantial benefits" due to the RTC's breach: namely, NLC was relieved of its obligation to continue payments under the Refinancing Agreement, which, over the time remaining on the Agreement, would have

amounted to approximately $510,000. Def.'s Opp. at 12. This argument, too, fails. Defendant's argument amounts to this: if a party performing an executory contract breaches exactly mid-performance, the aggrieved party has no right to sue for reliance damages, because after all, the breach has saved the aggrieved party exactly the amount it had already paid, and therefore the scales are even. Seen in this light, defendant's contention is exposed as illogical. Had NLC requested as damages the entire amount contemplated under the Refinancing Agreement, the amount of damages would certainly be offset by the amount of refinancing fees NLC had not yet paid. However, to offset against NLC's out-of-pocket payments the seeming "benefit" of release from further obligation undermines the concept of "reliance damages" to an unworkable degree. Accordingly, the Court finds that plaintiff is entitled to damages dating from the initial payment of refinancing fees under the Agreement, dating from the date of appointment of the RTC as Receiver, as discussed *infra.*[7]

D. *The Refinancing Agreement and OFC's*

Plaintiffs contend in their motion for summary judgment that the Refinancing Agreement is a Qualified Financial Contract, or "QFC." Under FIRREA, a QFC:

means any securities contract, commodity contract, forward contract, repurchase agreement, swap agreement, and any similar agreement that the Corporation determines by regulation to be a qualified financial contract for the purposes of this paragraph.

12 U.S.C. § 1821(e)(8)(D)(i). *See also* 12 C.F.R. 360.5 (1995) (defining certain other agreements as "qualified financial contracts"). Under 12 U.S.C. § 1821(e)(3)(A)(ii)(II), the liability of the receiver for the repudiation of a QFC dates not from the date of the appointment of the

---

**7.** Although defendant contends that there is "a genuine issue of material fact concerning the amount paid," Def.'s Opp. at 15, plaintiffs' motion for summary judgment and its response to defendant's opposition, coupled with the filings of both parties, indicate that no genuine issue of fact exists as to whether payments were made regularly under the Refinancing Agreement. *See* 1993 Nelson Aff., Exs. A–D; *see also* 59 F.3d at 240 ("Nashville and its predecessors paid the fees regularly through October 1991").

receiver, but from the date of the repudiation of the QFC. In this case, if the Refinancing Agreement is found to be a QFC, plaintiffs would be entitled to include in their damage calculations their October 1991 payment of $6,686.47 in refinancing fees, since the RTC was appointed receiver for Savers Savings in September and did not repudiate the Refinancing Agreement until December.[8]

■ Nashville's argument is as follows: the Refinancing Agreement is an option for NLC to sell a note to Savers, the amount of which would be sufficient to pay the Loan; a note is a security; an option to sell a security is a securities contract; therefore, since securities contracts are considered to be QFC's, the Refinancing Agreement is a QFC. Plaintiffs' argument falls on the first step. The Refinancing Agreement is not an option to sell a note; it is (or was) simply a commitment on the part of Savers to refinance the current Loan. *See Heiko v. FDIC*, 1995 WL 117604 (S.D.N.Y. March 17, 1995) (refinancing agreement repudiated by FDIC was not a QFC, because the agreement "did not involve the purchase, sale or loan of a mortgage or a mortgage-related security ... if a QFC were deemed to include mortgages, the exception would swallow the rule"). Plaintiffs' failure to cite to any case law to support their unique theory supports the Court's conclusion that the theory is not only unique, but without merit. Accordingly, this aspect of plaintiffs' motion for summary judgment is denied, and damages will be awarded dating from the date of appointment of the RTC as Receiver for Savers.

### E. *The Issue of Prejudgment Interest*

Plaintiffs request that they be awarded the back fees paid to Savers under the Refinancing Agreement, plus accrued interest thereon at the rate of 9.5% per annum. Defendant argues in its opposition that under Tennessee law, plaintiff is not entitled to interest on its claim for fees. Defendant contends that prejudgment interest is discretionary, to be awarded only when the obligation is certain and is not disputed on reasonable grounds. *See Mitchell v. Mitchell*, 876 S.W.2d 830, 832 (Tenn.1994). Finally, defendant argues that

its obligation is not "certain" because it disputes whether certain payments were made, and that it was reasonable to dispute that the obligation existed in the first place.

■ Plaintiffs argue that defendant misapprehends the law: while an award of prejudgment interest is left to the discretion of the judge, it is "[t]he usual means ... familiar and almost commonplace" of compensating for the loss of funds resulting from the breaching party's failure to pay an obligation according to its terms. Pls.' Reply at 14 (quoting *Mitchell*, 876 S.W.2d at 832 [citing *Deas v. Deas*, 774 S.W.2d 167, 170 (Tenn. 1989) ] ). As to whether the amount in question is "certain," plaintiffs state (and the Court agrees, *see* note 6 *supra*) that NLC's claim for past fees is certain and easily calculable. As to whether defendant was reasonable in disputing its obligation, plaintiffs are correct in noting that defendant has employed shifting, inconsistent and ultimately untenable arguments to support its contention that it was free from liability (or, in the alternative, that the amount it owed to Nashville was far less than that which Nashville projected). Accordingly, in its discretion, the Court awards prejudgment interest at the 9.5% per annum loan rate to plaintiffs.

### Conclusion

For the foregoing reasons, plaintiffs' motion for summary judgment is granted in part and denied in part. Defendant's motion for partial summary judgment is denied.

---

8. Nashville paid no fees in November and December.