United States Court of Appeals,

Eleventh Circuit.

No. 94-5045.

Samuel M. McMILLIAN, Jr., Plaintiff-Appellant,

v.

 FEDERAL DEPOSIT INSURANCE CORPORATION, as receiver of Southeast Bank, N.A. and as de facto ERISA fiduciary of the Southeast Bank, N.A. Reduction in Force Severance Pay Plan, Defendant-Appellee.

April 25, 1996.

Appeal from the United States District Court for the Southern District of Florida. (No. 93-273-CIV-KMM), K. Michael Moore, Judge.

Before TJOFLAT, Chief Judge, and KRAVITCH and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

Samuel M. McMillian, Jr., appeals the district court's dismissal of his action for severance pay against the FDIC as receiver of a failed bank. The district court dismissed McMillian's Worker Adjustment and Retraining Notification ("WARN") Act claim for lack of jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). We affirm the district court's disposition of the WARN Act claim. With respect to McMillian's Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") claim, the district court dismissed the complaint pursuant to Fed.R.Civ.P. 12(b)(6). This appeal raises two FIRREA issues: (1) whether FIRREA bars the enforcement of severance pay agreements because they are "contingent"; and (2) whether severance payments constitute "actual direct compensatory damages" under FIRREA. The district court held that McMillian's claim is barred because his right to receive severance pay was contingent when the FDIC was

appointed receiver.  We reverse.

## I. FACTS

McMillian was a janitor at Southeast Bank, N.A. ("Southeast") for nineteen years.  Through Southeast and its parent, Southeast Banking Corporation, McMillian was a participant in and beneficiary of various employee benefit plans sponsored, at least in part, by Southeast.  In particular, he was a participant in Southeast's Reduction in Force Severance Pay Plan ("Severance Plan"), which provided, in relevant part:

> In the event of a Participant's termination of employment as a result of a Reduction In Force, the Participant shall be entitled to receive from [Southeast] a Severance Payment in the amount provided in Section 4.2 and the other Severance Benefits provided in Section 4.4.

(Southeast Banking Corporation Reduction in Force Severance Pay Plan § 4.1).  Under Section 4.2, participants who had been employed by Southeast for more than two years were entitled to one week of severance pay per year of employment.[1]  The Severance Plan defines "Reduction in Force" as "the involuntary termination of employment of a Participant because of the elimination of such Participant's position with [Southeast or its parent] due to economic or business conditions, reorganizations of the Company which combine or limit positions or for other reasons."

On September 19, 1991, the Office of the Comptroller of the Currency declared Southeast insolvent and appointed the FDIC receiver under 12 U.S.C. § 1821(c).  Within two days thereafter,

---

[1]Section 4.4 entitled employees to other severance benefits such as life, health, and dental insurance if they qualified for severance pay.  These benefits would continue so long as the terminated employee continued to receive severance pay.

the FDIC terminated McMillian's employment and granted him two weeks of severance pay.  There is no dispute that McMillian was terminated as a result of a "reduction in force."

Claiming that he was entitled to nineteen weeks of severance pay based on his nineteen years with the bank, McMillian filed a claim for benefits under the Severance Plan with the FDIC.  The FDIC disallowed the claim[2] and McMillian filed suit in the United States District Court challenging the FDIC's action.  In his complaint, McMillian alleged a claim under the WARN Act, 29 U.S.C.A. § 2101 *et seq.,* and a claim for damages under FIRREA, 12 U.S.C.A. § 1821(e).

The magistrate judge submitted a Report and Recommendation granting the FDIC's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6).  The magistrate judge recommended dismissal on the grounds that:  1) the district court lacked subject matter jurisdiction over McMillian's WARN Act claim;  and 2) McMillian's severance pay claim was "contingent" as of the appointment of the FDIC as receiver and, therefore, not cognizable under FIRREA, 12 U.S.C.A. § 1821(e)(3)(A)(ii)(I).

With respect to the severance pay claim under FIRREA, the magistrate judge based his conclusion almost entirely on two cases:

---

[2]In its letter rejecting McMillian's claim, the FDIC based its decision on its conclusion that the Severance Plan was sponsored by the parent, Southeast Banking Corporation and, therefore, was not a claim against the subsidiary, Southeast Bank, receivership estate.  Further, with respect to the parent, the FDIC claimed that the Severance Plan was "eliminated because of the filing for bankruptcy by Southeast Bank."  It appears that the FDIC abandoned this argument in its motion to dismiss below and on appeal to this Court.  Hence, we assume that Southeast Bank was the sponsor and that the Severance Plan was not terminated by the bankruptcy proceedings.

*American Nat'l Bank v. FDIC,* 710 F.2d 1528, 1540 (11th Cir.1983), and *Office & Professional Employees Int'l Union v. FDIC,* 813 F.Supp. 39, 45 (D.D.C.1993). From these cases, he reasoned that the rights and liabilities of Southeast and its creditors were fixed at the declaration of insolvency. Those claims which had not accrued as of the appointment of the receiver, the magistrate judge concluded, are not cognizable under FIRREA. Because McMillian's claim for benefits under the Severance Plan was found to be contingent—i.e., it did not accrue until his termination due to a Reduction in Force—it was not fixed as of the appointment of the FDIC and therefore failed.

After the magistrate judge submitted his Report and Recommendation, but before the district court entered its order, the D.C. Circuit reversed the district court in *Office & Professional Employees Int'l Union.* *Office & Professional Employees Int'l Union v. FDIC,* 27 F.3d 598 (D.C.Cir.1994) ("*OPEIU* "). The district court nonetheless adopted the magistrate judge's recommendations based on what it considered the binding precedent of *American Nat'l Bank, supra,* and *Bayshore Executive Plaza Partnership v. FDIC,* 750 F.Supp. 507 (S.D.Fla.1990), *aff'd on other grounds,* 943 F.2d 1290 (11th Cir.1991).

## II. DISCUSSION

A. *WARN Act Claim*

McMillian challenges the district court's dismissal of his WARN Act claim for lack of jurisdiction. He essentially argues that the Severance Plan was drafted to "operate in tandem" with the WARN Act, and thus incorporated it by reference.

We review questions of subject matter jurisdiction *de novo.* *Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians,* 999 F.2d 503, 506 (11th Cir.1993). The rule in this circuit is clear: "FIRREA makes exhaustion of the FDIC's administrative complaint review process mandatory when the FDIC has been appointed receiver for a financial institution." *Motorcity of Jacksonville, Ltd. v. Southeast Bank,* 39 F.3d 292, 296 (11th Cir.1994), *vacated,* 58 F.3d 589 (11th Cir.1995).

In this case, McMillian has sued the FDIC in its capacity as receiver of Southeast; however, he did not file a WARN Act claim, either implicitly or explicitly, with the FDIC before bringing this action. Accordingly, we hold that the district court did not have jurisdiction of McMillian's WARN Act claim because he failed to exhaust his administrative remedies as required by FIRREA.

B. *Severance Pay Claim*

Under FIRREA, the FDIC has the power to repudiate any contract to which it is a party, that it determines to be burdensome, and the repudiation of which will promote the orderly administration of the institution's affairs. 12 U.S.C.A. § 1821(e)(1). The election to repudiate a contract must be made within a reasonable time following the appointment of the receiver. 12 U.S.C.A. § 1821(e)(2).

Once the FDIC has repudiated, damages are measured by § 1821(e)(3), which provides, in relevant part:

(A) In general

Except as otherwise provided in subparagraph (C) and paragraphs (4), (5), and (6), the liability of the conservator or receiver for the disaffirmance or repudiation of any contract pursuant to paragraph (1) shall be—

(i) limited to actual direct compensatory damages;  and

(ii) determined as of—

   (I) the date of the appointment of the ...
   receiver....

(B) No liability for other damages

   For purposes of subparagraph (A), the term "actual direct compensatory damages" does not include—

(i) punitive damages;

(ii) damages for lost profits or opportunity;  or

(iii) damages for pain and suffering....

This case squarely confronts the meaning of these sections. The FDIC presses two grounds of support for the district court's dismissal of the case:  (1) the severance payments were contingent at the time FDIC was appointed receiver because McMillian's employment had not yet been terminated—thus, McMillian's claim was not provable under the pre-FIRREA common law;[3]  and (2) the relief for which McMillian prays does not constitute "actual direct compensatory damages" as contemplated by FIRREA.  We examine these arguments in turn.

1. Contingent Contract Rights and Provability

   The FDIC strenuously argues that contingent contract rights do not form a basis for recovery under FIRREA.  This Court has stated that "[i]t is well settled that the rights and liabilities

---

[3]The Severance Plan ostensibly permitted Southeast to terminate it so long as certain procedures were followed.  The parties have not addressed the relevance of this or the apparent fact that the Severance Plan was not terminated prior to McMillian's discharge.  Because of the 12(b)(6) posture of this case, we do not address these issues as they relate either to the contingency issue or to the value of McMillian's claim, leaving them for appropriate development in the district court on remand.

of a bank and the bank's debtors and creditors are fixed at the declaration of the bank's insolvency." *American Nat'l Bank v. FDIC,* 710 F.2d 1528, 1540 (11th Cir.1983) (citing *First Empire Bank v. FDIC,* 572 F.2d 1361, 1367-68 (9th Cir.), *cert. denied,* 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978); *FDIC v. Grella,* 553 F.2d 258, 262 (2d Cir.1977); *Kennedy v. Boston-Continental National Bank,* 84 F.2d 592, 597 (1st Cir.1936), *cert. [dismissed],* 300 U.S. 684, 57 S.Ct. 667, 81 L.Ed. 887 (1937)). Based on this language, the FDIC concludes that if a contract is in any way contingent, i.e., not fixed, as of the date of the appointment of the receiver, its subsequent breach does not give rise to damages.[4]

The FDIC contends that, at the moment it was appointed

---

[4]The cases upon which the FDIC relies for its contingency argument were decided prior to the enactment of FIRREA in 1989. The parties do not address whether FIRREA has preempted the common law rules regarding repudiation, but rather, they assume that their reach is coextensive. Because we conclude that McMillian's claim is not barred by the pre-FIRREA common law rules of provability, we need not address whether these rules continue to apply. *See generally, O'Melveny & Myers v. FDIC,* --- U.S. ----, ----, 114 S.Ct. 2048, 2054, 129 L.Ed.2d 67 (1994); *RTC v. Ford Motor Credit Corp.,* 30 F.3d 1384, 1388 (11th Cir.1994). We note that there exists some conflict among the courts which have addressed this issue. *Compare Office and Professional Employees Int'l Union v. FDIC,* 27 F.3d 598, 602-03 (D.C.Cir.1993) (assuming *sub silentio* that the common law remained intact after the passage of the statute, although not directly addressing this issue); *Hennessy v. FDIC,* 58 F.3d 908, 917-18 (3d Cir.1995) (same); *and Dababneh v. FDIC,* 971 F.2d 428, 433-34 (10th Cir.1992) (reading FIRREA as a codification of existing federal common law); *Bayshore Exec. Plaza Partnership,* 750 F.Supp. at 509 n. 5 (same); *Credit Life Ins. Co. v. FDIC,* 870 F.Supp. 417, 426 (D.N.H.1993); *Otte v. FDIC,* 990 F.2d 627 (5th Cir.1993) (table) (suggesting that the provability doctrine should be read into FIRREA through the "actual direct compensatory damages" language of § 1821(e)(3)); *with Nashville Lodging Co. v. RTC,* 59 F.3d 236, 244 (D.C.Cir.1995) (reading portions of the repudiation section of FIRREA to change common law); *Bank One, TX, N.A. v. Prudential Ins. Co. of America,* 878 F.Supp. 943, 947 n. 1 (N.D.Tex.1995) (same).

receiver, McMillian had a right to collect severance pay that was contingent upon his discharge due to a Reduction in Force. As merely a contingent right, the FDIC posits, McMillian's severance pay is not recoverable. We disagree.

This argument mistakes the common law. The cases outside the lease context which require that rights and liabilities must be fixed upon insolvency simply require that the contract right (as opposed to a mere expectancy) arose before insolvency and that the claim is not based on a new, post-insolvency contract. To understand why the very language quoted by the FDIC in support of its contingency argument supports McMillian, we must take a step back and review the origin of these rules.

The common law cases, i.e., those decided prior to FIRREA, were based on the National Bank Act, which provided that a receiver of a failed national bank

> shall make a ratable dividend of the money so paid over to him ... on all such claims as may have been proved to his satisfaction or adjudicated in a court of competent jurisdiction.

12 U.S.C.A. § 194 (1988).

The statute encompassed two related concepts that reappear in pre-FIRREA cases: ratability and provability. *See, e.g., Citizens State Bank of Lometa v. FDIC,* 946 F.2d 408 (5th Cir.1991); *Hennessy v. FDIC,* 58 F.3d 908 (3d Cir.1995). Of these, only provability is at issue in this case.[5] The National Bank Act did

---

[5]The ratable distribution concept directs that "dividends be declared proportionately upon the amount of all claims as they stand on the date of insolvency." *American Sur. Co. v. Bethlehem Nat'l Bank,* 314 U.S. 314, 417, 62 S.Ct. 226, 228, 86 L.Ed. 241 (1941).

not specify the requirements of a "provable claim."  "Instead, Congress intended that the just and equal distribution of an insolvent bank's assets be effected "through the operation of familiar equitable doctrines' fashioned by the courts." *Bank One, TX, N.A. v. Prudential Ins. Co. of America,* 878 F.Supp. 943, 954 (N.D.Tex.1995) (quoting *Citizens State Bank of Lometa,* 946 F.2d at 412; *American Sur. Co. v. Bethlehem Nat'l Bank,* 314 U.S. 314, 316, 62 S.Ct. 226, 228, 86 L.Ed. 241 (1941)).  Most courts adopted the so-called "provability test" under which a claim is provable against the FDIC as receiver if:  (1) it existed before the bank's insolvency and did not depend on any new contractual obligations arising thereafter;  (2) liability on the claim was absolute and certain in amount when suit was filed against the receiver;  and (3) the claim was made in a timely manner. *See, e.g., Dababneh v. FDIC,* 971 F.2d 428, 434 (10th Cir.1992);  *Citizens State Bank of Lometa v. FDIC,* 946 F.2d 408, 412 (5th Cir.1991);  *First Empire Bank v. FDIC,* 572 F.2d 1361, 1367-69 (9th Cir.1978).

Only the first prong is at issue here.  It requires, in part, that the claim must exist before the bank's insolvency.  A claim exists before insolvency if it is based on a pre-insolvency contract which requires payment upon a stated event. *See Citizens*

---

> Ratability obligates the court to focus on the point in time that insolvency is declared.  [Cit.]  A creditor's claim that increases after insolvency must be denied, because the claim will change the amount of the creditor's ratable share.  [Cit.]  The value of a claim is therefore fixed no later than the point of insolvency.

> *Bank One, TX, N.A. v. Prudential Ins. Co. of America,* 878 F.Supp. 943, 954 (N.D.Tex.1995).

*State Bank,* 946 F.2d at 415;  *OPEIU,* 27 F.3d at 601-02;  *First Empire Bank,* 572 F.2d at 1368-69 (finding that contingent claims of which the worth or amount can be determined by recognized methods of computation at a time consistent with the expeditious settlement of the estates are provable);  *Bank One, TX,* 878 F.Supp. at 955. The fact that certain post-insolvency events affect liability under a pre-insolvency contract does not necessarily mean that the claim did not exist before insolvency. *See Citizens State Bank,* 946 F.2d at 415;  *OPEIU,* 27 F.3d at 603.  It is the contract right which must exist before insolvency, not the fully-matured obligation to pay.

Thus, the FDIC's reliance on cases which state that a claim is only provable if it exists before the bank's insolvency is misplaced.  This aspect of the provability rule is plainly satisfied in this case because the Severance Plan existed before insolvency.

The first prong of the provability test also requires that the claim cannot depend on contracts arising after insolvency, i.e., "new contracts."  This rule is derived from a line of cases which generally involve claims for future rent. *See, e.g., Kennedy v. Boston-Continental Nat'l Bank,* 84 F.2d 592 (1st Cir.1936), *cert. dismissed,* 300 U.S. 684, 57 S.Ct. 667, 81 L.Ed. 887 (1937); *Argonaut Sav. & Loan Ass'n v. FDIC,* 392 F.2d 195 (9th Cir.), *cert. denied,* 393 U.S. 839, 89 S.Ct. 116, 21 L.Ed.2d 110 (1968);  *FDIC v. Grella,* 553 F.2d 258 (2d Cir.1977);  *Dababneh v. FDIC,* 971 F.2d 428 (10th Cir.1992);  *80 Pine, Inc. v. European Am. Bank,* 424 F.Supp. 908 (E.D.N.Y.1976);  *Executive Office Centers, Inc. v. FDIC,* 439

F.Supp. 828 (E.D.La.1977), *aff'd,* 575 F.2d 879 (5th Cir.1978) (per curiam). Since *Kennedy,* the better reasoned cases simply stand for the proposition that new contractual obligations created after insolvency do not give rise to "provable" claims and, as a specific application of this general rule, claims for future rent are not provable.

In *Kennedy,* the court examined whether a lessor's assignee could recover liquidated damages under a lease covenant which provided that such damages did not accrue until the landlord sent written demand, gave notice, and reentered the property. 84 F.2d at 595. Upon reentry, the agreement provided that the lessee became liable for liquidated damages. *Id.* The court stated the rule that the bank's liability must have accrued and become unconditionally fixed by the time of insolvency. *Id.* at 597. It held, therefore, that the lessor's assignee could not recover because his claim was based on a "new contract" which was created by the affirmative act of reentry. *Id. Accord Argonaut Savings and Loan Ass'n v. FDIC,* 392 F.2d 195, 197 (9th Cir.), *cert. denied,* 393 U.S. 839, 89 S.Ct. 116, 21 L.Ed.2d 110 (1968). In other words, the assignee could not recover the liquidated damages because his entitlement to them was created by a post-insolvency contract.

The FDIC and the cases it cites rely on the statement in *Kennedy* that "[i]f nothing is due at the time of insolvency, the claim should not be allowed, for that would be in violation of the National Bank Act (12 U.S.C.A. § 194) calling for a ratable distribution." *Id.* From this, the FDIC gleans that "no reference whatsoever should be made to post-insolvency events, and that a

claim must be "absolutely' *fixed, due,* and *owing* as of the *date of insolvency* to be "provable'...." *Citizens State Bank,* 946 F.2d at 413 (characterizing the FDIC's argument).

This statement in *Kennedy,* however, only applies in the lease context and is better represented outside this context by the court's "new contract" theory.[6]  In *First Empire v. FDIC,* 572 F.2d

---

[6]In *Kennedy,* the court examined how future lease payments should be treated in the context of a national bank receivership. 84 F.2d at 597-98.  As pointed out by the dissent in that case, the court could have either followed the bankruptcy rule (under which future lease payments were not provable) or the equity rule (under which they were provable).  *Kennedy,* 84 F.2d at 598-99 (Morton, J., dissenting in part).

> Review of the bankruptcy rules in effect at the time *Kennedy* was decided reveals the limited scope of that decision.  Prior to the 1934 amendments to the Bankruptcy Act of 1898, claims for rent under a lease due after the trustee's repudiation were not recoverable. *See generally,* 3 *Collier on Bankruptcy* § 502.02[7] (1979).  This treatment of leases derived from the traditional theory of rent as laid down by Lord Coke:  " "Rent is a sum stipulated to be paid for the actual use and enjoyment of another's land.... The actual enjoyment of the land is the consideration for the rent which is to be paid....  From this it seems clear, that although there be a lease, which may result in a claim for rent, which will constitute a debt, yet no debt accrues until such enjoyment has been had.' " *Clark on Receivers* § 446(b) (19__) (quoting *Bordman v. Osborn,* 23 Pickering (Mass.) 295 (1939)).  The Bankruptcy Act, as originally drafted, reflected this theory in that "[i]t was held that rent to accrue after the filing of the bankruptcy petition was incapable of proof as it was not a fixed liability absolutely owing but rather a demand contingent upon the occurrence of certain events." 3 *Collier on Bankruptcy* § 502.02[7] (1979).  Although the Bankruptcy Act recognized contingent non-lease claims, courts continually stopped short of extending the same liberality to claims based on breaches of leases. *Id.  See also Manhattan Properties v. Irving Trust Co.,* 291 U.S. 320, 332-39, 54 S.Ct. 385, 387-89 [78 L.Ed. 824] (1934).  Thus, "[w]hile from a strictly logical point of view there should be no need or justification to treat leases differently from other bilateral contracts, the development of a landlord's rights arising from the bankruptcy of his tenant led to so many deviations from the general law applicable to contractual rights in bankruptcy that leases of real estate were for

1361 (9th Cir.1978), the court examined *Kennedy* and cases parroting its language and concluded that

> [a]lthough these cases use broad language, indicating that the bank's liability on any claim must have accrued and be unconditionally fixed at the date of insolvency, they are, by virtue of their dependence on the "new contract' principle, distinguishable from cases not dealing with lease options exercised after insolvency. The claims here are based on letters of credit that were in existence before insolvency and are not dependent on any new contractual obligations arising later.

*Id.* at 1367. The court properly concluded that *Kennedy* 's broad language should be limited to cases involving leases and the loss of future rent. *Id.* at 1368. It explicitly stated that the rule should not be extended to other contingent obligations:

> To follow those cases here would amount to extending into new areas a rule that now appears to be outmoded, based as it is on a bankruptcy rule that today has been repealed in favor of the contrary equity rule.

*Id.* As to other contracts, the court in *First Empire* adopted *Kennedy* 's new contract analysis.

In sum, the "fixed, due and owing" language from *Kennedy* has

---

many years considered *sui generis*." 3 *Collier on Bankruptcy* § 502.02[7] (1979).

The court in *Kennedy* elected to follow the soon-to-be outdated bankruptcy rule which precluded recovery of future lease payments. *First Empire,* 572 F.2d at 1367-68. The bankruptcy rule on which *Kennedy* was based was subsequently repealed in favor of a broad and liberal provability rule. *See* 11 U.S.C.A. § 101(5); *First Empire,* 572 F.2d at 1368. Nonetheless, in the present bankruptcy code (and, in fact, in FIRREA) leases "remain in a category apart from other contract claims." *First Empire,* 572 F.2d at 1368.

In sum, the court in *Kennedy* created the "new contract" theory which continues to find application in the common law provability doctrine. *See Dababneh,* 971 F.2d at 434; *Citizens State Bank,* 946 F.2d at 412; *First Empire Bank,* 572 F.2d at 1367-69. The strict "due and owing" language in *Kennedy,* however, has been confined to claims for future rent.

been applied strictly in the context of lease payments on the grounds that such payments are not provable.  *See Dababneh,* 971 F.2d at 435.  Courts have uniformly deemed claims for future rent "unprovable," *see id.* (citing cases), and FIRREA continues this distinction by providing separate rules in the lease and non-lease contexts.  *Compare* 12 U.S.C.A. § 1821(e), *with* § 1821(e)(3).  These cases are distinguishable simply by virtue of the fact that they involve claims for future lease payments.  As to other contracts, however, the strong language in *Kennedy* simply refers to the common law rule of provability discussed *supra* (i.e., claims cannot depend upon post-insolvency contracts).

A careful review of the leading cases, particularly those cited in *American Nat'l Bank,* 710 F.2d at 1540, reveals strong support for these general propositions.  In *First Empire Bank,* the court confronted the issue of whether standby letters of credit are provable.  The court held that such claims are provable because the liability was absolute and certain *when the suit was filed against the receiver.*  572 F.2d at 1369.  The fact that the standby letters of credit were to some extent contingent at the time the receiver was appointed did not destroy their provability.

In *FDIC v. Grella,* 553 F.2d 258 (1977), the First Circuit examined the rights of lessors to collect future rent from the FDIC.[7]  The court applied the indisputable rule that lessors have no rights to collect future rent, i.e., a claim for rent "must be due and owing at the time of insolvency, [cit.], otherwise it does

---

[7]It did so in the context of evaluating whether the FDIC had standing to bring a declaratory judgment action against the lessee.  *Id.* at 262.

not constitute a claim against a receiver regardless of what other rights the obligee may have." *Id.* at 262. This case provides no support for the theory that the right to collect under an ordinary contract (i.e., not a lease) against a bank must be fully matured and payable as of appointment of the receiver.

In *American Nat'l Bank v. FDIC,* 710 F.2d 1528 (11th Cir.1983), we had to decide which of two parties was entitled to an interpleaded sum of money. In disposing of an argument raised by the claimant against the FDIC, we stated that "[i]t is well settled that the rights and liabilities of a bank and the bank's debtors and creditors are fixed at the declaration of the bank's insolvency." *Id.* at 1540. Thus, we concluded that any attempt by the claimant to rely on events subsequent to the bank's closing in support of its claim to the fund "must fail since the rights of the parties were frozen ... when the Bank's doors were shut to business." *Id.* at 1540-41.

We relied on *First Empire, Grella,* and *Kennedy* to support this proposition. Those cases, read properly, stand for the "new contract" theory, i.e., that rights cannot be created anew after appointment of the receiver. Indeed, this is how the rule was applied in *American Nat'l Bank* in that we rejected attempts by the claimant to rely on events subsequent to receivership to create new contractual rights. In *American National Bank,* the claimant failed to demonstrate any pre-insolvency entitlement to the fund. Accordingly, its attempts to rely on post-insolvency events to create new contractual rights were properly rejected by the court.

Finally, in *Dababneh v. FDIC,* 971 F.2d 428 (10th Cir.1992),

the Tenth Circuit examined the now-familiar question of whether future rents are "provable" under the pre-FIRREA common law. After repeating the oft-cited rule from *Kennedy* that rent must be due and owing at insolvency, and the rule from *First Empire* that claims for rent cannot depend upon "new contracts" arising after insolvency, the court held that future rents were not recoverable. *Id.* at 435 ("The federal courts have uniformly adopted *Kennedy* 's common law rule barring as "unprovable' claims for future rent against the receiver of an insolvent bank."). As with the other lease cases cited by the FDIC, *Dababneh* creates a rule which applies to claims for future rent, but falls flat with respect to other claims, which, although contingent, existed when the FDIC was appointed receiver. *Cf. First Empire Bank,* 572 F.2d at 1367 (finding that the lease cases, "by virtue of their dependence on the "new contract' principle, [are] distinguishable from cases not dealing with lease options exercised after insolvency"); *Dababneh,* 971 F.2d at 435 (finding that *First Empire* is distinguishable from the lease cases and "inapplicable by its own stated exception").

Thus, the FDIC's reliance on the common-law provability doctrine and on our language in *American Nat'l Bank* to support its contingency argument is misplaced. The provability doctrine, in relevant part, simply demands that claims must exist before the bank's insolvency (even if contingent) and that new contractual obligations cannot arise thereafter. [8] The pre-FIRREA cases

---

[8] In addition, the provability doctrine has been applied in a different and special way to claims for future rent. As discussed, these cases are distinguishable simply by virtue of the fact that they involve future rent.

uniformly state that rights and liabilities are fixed upon appointment of the receiver and that claims based upon new contracts are not "provable." These rules are consistent with the policy underlying their creation: ratability and provability. These cases do not support the proposition that any contingency destroys provability. *See FDIC v. Liberty Nat'l Bank & Trust Co.,* 806 F.2d 961, 965 (10th Cir.1986) ("Nothing in § 194 or the opinions cited ... requires us to hold that a bank's obligation to pay a fixed amount of money upon the occurrence of a specified event is rendered entirely null and void if the bank's insolvency intervenes before the triggering event occurs."). To the contrary, the cases permit claims which arise pre-insolvency to survive and only preclude claims based on new, post-insolvency contracts. As the Supreme Court put it over a century ago:

> The business of the bank must stop when insolvency is declared. [Cit.] No new debt can be made after that. The only claims the [receiver] can recognize in the settlement [of] the affairs of the bank are those which are shown by proof satisfactory to him or by the adjudication of a competent court to have had their origin in something done before the insolvency.

*White v. Knox,* 111 U.S. 784, 787, 4 S.Ct. 686, 687, 28 L.Ed. 603 (1884).

Here, at the time the FDIC was appointed receiver, McMillian was party to a contract with Southeast which entitled him to severance pay. This right was contingent, of course, on his discharge as a result of a "Reduction in Force." This contingency did not destroy McMillian's contract rights. The policies of ratability and provability are amply satisfied in this case. At the time the FDIC was appointed receiver, it could have simply

reviewed the bank records to determine that McMillian had a right to severance pay that would become payable upon his termination. Knowledge of this contingent right allowed it to plan accordingly.

The contract rights which gave rise to McMillian's claim were created before the FDIC was appointed receiver. The fact that these rights were contingent at that time is of no moment. "The employees had a right to severance pay as of the date of the appointment—albeit a contingent one—and that right should be treated essentially the same as the right to accrued vacation pay or health benefits." *OPEIU,* 27 F.3d 598, 601 (D.C.Cir.1994). It would make no sense to limit recovery under FIRREA to only those contracts in which all contingencies had been eliminated prior to appointment of the receiver. All contracts are to some extent contingent until both parties have performed or breached. The FDIC's interpretation would permit recovery only when a contract had been breached before receivership—a result clearly contrary to the plain language of the statute, Congress' intent, and the common law. Indeed, it would mean that things like health benefits and pension benefits would not be recoverable.

Our conclusion is supported by *OPEIU,* 27 F.3d 598 (D.C.Cir.1994). *Accord Monrad v. FDIC,* 62 F.3d 1169 (9th Cir.1995); *Citizens State Bank of Lometa v. FDIC,* 946 F.2d 408 (5th Cir.1991); and *Bank One, TX, N.A. v. Prudential Ins. Co. of Amer.,* 878 F.Supp. 943 (N.D.Tex.1995). *OPEIU* involved facts almost identical to this case. Plaintiffs claimed entitlement to severance pay under a collective bargaining agreement that was repudiated by the FDIC after it was appointed receiver. The FDIC

interposed the same contingency argument it presses on this Court. The court held that the contingent nature of these contracts did not render them unrecoverable on the grounds that they had not yet "accrued." *OPEIU,* 27 F.3d at 601.[9]  Instead, the court held that severance benefits should be treated the same as standby letters of credit in that they are provable even though the bank's obligation is still contingent as of the date of insolvency. *Id.* at 602-03 (citing *Citizens State Bank of Lometa v. FDIC,* 946 F.2d 408, 415 (5th Cir.1991);  *FDIC v. Liberty Nat'l Bank & Trust Co.,* 806 F.2d 961 (10th Cir.1986);  *First Empire Bank-New York v. FDIC,* 572 F.2d 1361 (9th Cir.), *cert. denied,* 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978)).  *See also Monrad v. FDIC,* 62 F.3d 1169, 1174 (9th Cir.1995) (concluding that, among the alternatives, *OPEIU* offers the better-reasoned approach to the severance pay issue); *Bank One, TX, N.A. v. Prudential Ins. Co. of America,* 878 F.Supp. 943, 955, 958 (N.D.Tex.1995) (holding that the FDIC is liable for contingent claims so long as those claims arose before insolvency and did not rely on new contractual obligations created after insolvency).

As the D.C. Circuit later explained:

To show that the claim had "accrued,' it was enough that if the bank had remained solvent and had unilaterally repudiated

---

[9]*See also Monrad v. FDIC,* 62 F.3d 1169, 1174 (9th Cir.1995) ("[T]he fact that the actual termination date post-dates the appointment of the receiver is insufficient to defeat an otherwise valid claim to severance pay.");  *Citizens State Bank of Lometa v. FDIC,* 946 F.2d 408, 415 (5th Cir.1991) ("That liability [under standby letters of credit] was actually triggered ... shortly [after insolvency] cannot be said to completely eradicate the contractual liability which originated from standby letters of credit pre-dating [the bank's] insolvency.").

the severance obligations, the employees could have sued successfully in court for the value of those benefits....  In short, the question of whether the employees' rights were sufficiently vested on the relevant date (and their claims sufficiently provable) turned on whether the insolvent bank's promise was "binding and enforceable under contract law' at that time.

*Nashville Lodging Co. v. RTC,*  59 F.3d 236, 244 (D.C.Cir.1995) (citing *OPEIU,* 27 F.3d at 602).

Our conclusion also finds strong support in an amendment to the Federal Deposit Insurance Act governing "golden parachute" contracts.  12 U.S.C.A. § 1828(k).[10]  This legislation, enacted one

---

[10]12 U.S.C.A. § 1828(k) provides, in relevant part:

> (k) Authority to regulate or prohibit certain forms of benefits to institution-affiliated parties

>> (1) Golden parachutes and indemnification payments

>> The Corporation may prohibit or limit, by regulation or order, any golden parachute payment or indemnification payment.

>> (2) Factors to be taken into account

>> The Corporation shall prescribe, by regulation, the factors to be considered by the Corporation in taking any action pursuant to paragraph (1) which may include such factors as the following:

>> (A) Whether there is a reasonable basis to believe that the institution-affiliated party has committed any fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse with regard to the depository institution or depository institution holding company that has had a material affect on the financial condition of the institution.

>> (B) Whether there is a reasonable basis to believe that the institution-affiliated party is substantially responsible for the insolvency of the depository institution or depository institution holding company, the appointment of a conservator or receiver for the depository institution, or the depository institution's troubled condition (as defined in the regulations

prescribed pursuant to section 1831i(f) of this title).

(C) Whether there is a reasonable basis to believe that the institution-affiliated party has materially violated any applicable Federal or State banking law or regulation that has had a material affect on the financial condition of the institution.

(E) Whether the institution-affiliated party was in a position of managerial or fiduciary responsibility.

(F) The length of time the party was affiliated with the insured depository institution or depository institution holding company and the degree to which—

(i) the payment reasonably reflects compensation earned over the period of employment;  and

(ii) the compensation involved represents a reasonable payment for services rendered.

(4) Golden parachute payment defined

For purposes of this subsection—

(A) In general

The term "golden parachute payment" means any payment (or any agreement to make any payment) in the nature of compensation by any insured depository institution or depository institution holding company for the benefit of any institution-affiliated party pursuant to an obligation of such institution or holding company that—

(i) is contingent on the termination of such party's affiliation with the institution or holding company;  and—

(ii) is received on or after the date on which—

(I) the insured depository institution or depository institution holding company, or any insured depository institution subsidiary of such holding company, is insolvent;

(II) any conservator or receiver is appointed for

year after the enactment of FIRREA, empowers the FDIC to promulgate

regulations disallowing certain severance payments defined as

"golden parachute payments."  It is clear from the golden parachute

---

such institution;

(III) the institution's appropriate Federal banking agency determines that the insured depository institution is in a troubled condition (as defined in the regulations prescribed pursuant to section 1831i(f) of this title);

(IV) the insured depository institution has been assigned a composite rating by the appropriate Federal banking agency or the Corporation of 4 or 5 under the Uniform Financial Institutions Rating System;  or

(V) the insured depository institution is subject to a proceeding initiated by the Corporation to terminate or suspend deposit insurance for such institution.

(B) Certain payments in contemplation of an event

Any payment which would be a golden parachute payment but for the fact that such payment was made before the date referred to in subparagraph (A)(ii) shall be treated as a golden parachute payment if the payment was made in contemplation of the occurrence of an event described in any subclause of such subparagraph.

(C) Certain payments not included

The term "golden parachute payment" shall not include—

(i) any payment made pursuant to a retirement plan which is qualified (or is intended to be qualified) under section 401 of Title 26 or other nondiscriminatory benefit plan;

(ii) any payment made pursuant to a bona fide deferred compensation plan or arrangement which the Board determines, by regulation or order, to be permissible;  or

(iii) any payment made by reason of the death or disability of an institution-affiliated party.

amendment that Congress expressly contemplated that some severance payments will be permissible notwithstanding the fact that payment is "contingent on the termination of such parties' affiliation with the institution."  12 U.S.C. § 1828(k)(4)(A)(i).[11]  If the FDIC's contingency argument were valid, the golden parachute provision would be wholly unnecessary, because all such contingent payments would be impermissible.

Our conclusion is inconsistent with the recent Third Circuit decision in *Hennessy v. FDIC,* 58 F.3d 908 (3d Cir.1995), and so we pause to explain our differences.  In *Hennessy,* former employees and managers of Meritor Savings Bank ("Meritor") sought to recover, *inter alia,* severance pay under a separation pay plan.  *Id.* at 912-13.  Under the plan, eligible employees were entitled to severance pay based on their experience and salary.  *Id.* at 913.  These benefits were triggered by involuntary termination as a result of "lack of work, job elimination, reorganization or reduction-in-force."  *Id.*  After Meritor was declared insolvent and the FDIC was appointed receiver, the FDIC repudiated the severance plan.  *Id.* at 914.

The court in *Hennessy* adopted the rule from *American Nat'l Bank,* 710 F.2d at 1540, that rights and liabilities of a bank and its debtors and creditors are fixed as of the date of the declaration of a bank's insolvency.  *Hennessy,* 58 F.3d at 918.  In

---

[11]We are not persuaded otherwise by the footnote to the supplementary information preceding the proposed regulations which reads:  "Claims for certain benefits may not be provable or constitute "actual direct compensatory damages' ... if the institution is placed in receivership.  This regulation does not provide otherwise."  60 Fed.Reg. 16,069, 16,077 n. 13 (1995).

addition, it applied the language from *Kennedy,* that a claim must have accrued and become unconditionally fixed on or before the bank's insolvency. *Id.* Applying these rules to severance payments, the court concluded that because the severance benefits had not "vested" prior to the FDIC's appointment as receiver, they had not "accrued" and were, therefore, unrecoverable. *Id. Accord FDIC v. Coleman,* 611 So.2d 1300 (Fla.App. 4 Dist.1992).

Insofar as the court relied on the rule we enunciated in *American Nat'l Bank,* it misconstrued the meaning of that case. The rule that rights and liabilities are fixed at insolvency, as discussed *supra,* does not preclude liability for contracts which are to some extent contingent at insolvency. Instead, the common-law rule of provability (of which the rule in *American Nat'l Bank* is a restatement) precludes liability for claims which did not exist prior to insolvency and for claims which depend on new contractual obligations created after insolvency. To the extent the court in *Hennessy* relied on *Kennedy,* it applied rules that belong exclusively in the lease context or misapplied the rules embodying the "new contract theory."

The FDIC also relies on *Bayshore Exec. Plaza Partnership v. FDIC,* 750 F.Supp. 507 (S.D.Fla.1990), *aff'd on other grounds,* 943 F.2d 1290 (11th Cir.1991), to support its contingency argument. Its reliance is misplaced, however, as *Bayshore* involved a lessor's attempt to recover rent that had accrued one year after the bank's declaration of insolvency. The court simply applied the hoary rule that rights and liabilities are frozen at insolvency, *American Nat'l Bank,* 710 F.2d at 1540, and the interpretation most courts

have given this rule in the lease context to conclude that the FDIC was not liable for the post-insolvency rent. *See, e.g., FDIC v. Grella,* 553 F.2d 258 (2d Cir.1977).

Thus, we hold that the common law provability rules, if they continue to apply, do not bar the enforcement of McMillian's Severance Plan.

2. "Actual Direct Compensatory Damages"

We address next the second ground proffered by the FDIC in support of the district court's opinion. The FDIC contends that even if McMillian's severance pay is provable, it does not constitute "actual direct compensatory damages" within the meaning of 12 U.S.C.A. § 1821(e)(3). Instead, it argues that the Severance Plan provides for a kind of liquidated damages, i.e., the plan is intended to liquidate the damages resulting from the termination of an employee.

We face a split among the circuits on this question. The FDIC urges that we adopt the reasoning of *Howell v. FDIC,* 986 F.2d 569 (1st Cir.1993). There, the First Circuit held that severance payments are not "actual direct compensatory damages" because they are "at best an estimate of likely harm made at a time when only prediction is possible." *Id.* at 573. Thus, the court concluded that severance payments are equivalent to liquidated damages or even penalties (when the damages are quite large). *Id.* In its view, employees would have no way of proving actual damages at the time of termination because they could prove neither employment opportunities foregone nor the possibility that they might mitigate damages by finding new employment. *Id.* Therefore, according to

the court in *Howell,* severance pay protects employees from their inability to prove actual damages by liquidating the liability.[12] *Id.  See also Hennessy v. FDIC,*  58 F.3d 908, 921 (3d Cir.1995) (following *Howell* with little or no analysis);  *Westport Bank & Trust Corp. v. Geraghty,* 865 F.Supp. 83, 86 (D.Conn.1994) (citing *Howell,* 986 F.2d at 573) ("Courts have found that damages resulting from the repudiation of a severance package are not "actual direct compensatory damages' within the meaning of § 1821 because they are analogous to liquidated damages.");  *Lanigan v. RTC,* No. 91 C 7216, 1993 WL 792085 (N.D.Ill. March 31, 1993) (following *Howell* ).  The courts following *Howell* generally conclude that because severance payments are in the nature of liquidated damages, they are not *actual* damages and thus do not fall within the "actual direct compensatory damages" contemplated by § 1821(e)(3).

By contrast, at least two circuits have found that severance payments comprise "actual direct compensatory damages." *See, e.g., Monrad v. FDIC,* 62 F.3d 1169 (9th Cir.1995);  *OPEIU,* 27 F.3d 598 (D.C.Cir.1994).  In *OPEIU,* the D.C. Circuit addressed and rejected the *Howell* court's characterization of severance payments as liquidated damages.  The D.C. Circuit pointed to a logical inconsistency in the *Howell* opinion.  Although the employees were at will employees, the *Howell* court treated the severance pay as

---

[12]As further support for its conclusion, *Howell* relied on what it guessed Congress intended by "actual direct compensatory damages":  "It is fair to guess that Congress, faced with mountainous bank failures, determined to pare back damages claims founded on repudiated contracts." *Id.* at 572.  The court concluded that Congress simply intended to disallow claims it deemed "less worthy" and, accordingly, it is reasonable that they intended to exclude severance pay. *Id.*

liquidated damages—i.e., "an approximation of the employee's future salary for an agreed term." 27 F.3d at 604. However, because the employment was at will, the termination of employment was not a breach of any contract and, therefore, it was logically inconsistent to treat the severance pay as liquidated damages for termination of the employment.

Rather than liquidated damages for termination of employment, the D.C. Circuit viewed severance pay as part of the employee's compensation package. *Id.* at 603 ("An employer's promise to make severance payments is part of the *consideration* of the employment contract.").[13] Likewise, in *Monrad,* the Ninth Circuit considered the analysis in *Howell* and *Hennessy,* rejected it, and concluded that the D.C. Circuit's opinion in *OPEIU* was better reasoned.

In this case, it appears that McMillian's employment was at will, not for a term of years. As pointed out by the D.C. Circuit in *OPEIU,* the termination of McMillian's employment did not, by itself, breach a contract, and thus, the termination logically could not give rise to liquidated damages. As in *OPEIU,* McMillian's severance pay appears to have been part of his compensation package. McMillian and other employees became

---

[13]The FDIC attempts to distinguish *OPEIU* on the grounds that the severance benefits in that case were part of compensation under a collective bargaining agreement. This attempt to distinguish *OPEIU* misses the D.C. Circuit's point. *OPEIU* found that severance pay merely modifies the at will employment relationship between the parties by providing employees an entitlement upon termination where there would otherwise be none. *See Monrad,* 62 F.3d at 1174 ("[*OPEIU* ] construed severance pay agreements as enforceable modifications of at will employment; whether the payment plan was provided in a specific collective bargaining agreement appears to be irrelevant to its analysis.").

eligible for severance pay after two years of employment and the amount of severance pay to which they were entitled increased with seniority. The increase of benefits based on seniority is inconsistent with the concept of liquidated damages. The years of employment would not be relevant to an estimation of the damages which an employee might incur as a result of being terminated. Instead, the fact that severance pay increases with seniority supports McMillian's position that it was part of his compensation. *Cf. Nolde Bros., Inc. v. Log. No. 358, Bak. & Conf. Wkrs. U.,* 430 U.S. 243, 248 n. 4, 97 S.Ct. 1067, 1070 n. 4, 51 L.Ed.2d 300 (1977) ("The fact that the amount of severance pay to which an employee is entitled under the ... agreement varies according to the length of his employment and the amount of his salary ... supports the ... position that severance pay was nothing more than deferred compensation."). An increase in benefits based on seniority is a common practice in developing the structure of compensation packages. Like the D.C. Circuit in *OPEIU,* we believe McMillian's severance pay was part of his compensation package—i.e., "part of the consideration of the employment," *OPEIU,* 27 F.3d at 603—similar to health and pension benefits.[14]

---

[14]The FDIC argues that the language of the Severance Agreement indicates that the severance pay is liquidated damages. The FDIC relies upon the following language:

> The purpose of the [Severance] Plan is to financially assist qualifying employees, who become unemployed as result of a Reduction in Force, through a period of readjustment while they seek new employment by providing them with severance benefits.

We reject the FDIC's argument. The quoted language does not purport to estimate damages; indeed, as we have noted, the termination was not a breach of contract and thus triggered

Our task is the interpretation of the statutory term "actual direct compensatory damages."  We note that there is no relevant legislative history;  the parties have cited none, and we have been able to find none.  *See Howell,* 986 F.2d at 572.  Thus, our analysis relies upon the plain meaning of the statutory language. It is also informed, however, by two statutory provisions—i.e., the express statutory exclusion of punitive damages, lost profits and damages for pain and suffering, 12 U.S.C.A. § 1821(e)(3)(B);  and the inference of congressional intent arising from the golden parachute amendment.  *See supra* note 10.

We begin with the plain meaning of the phrase.  *See Perrin v. United States,* 444 U.S. 37, 42-43, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary common meaning.");  *United States v. McLymont,* 45 F.3d 400, 401 (11th Cir.), *cert. denied,* --- U.S. ----, 115 S.Ct. 1723, 131 L.Ed.2d 581 (1995) ("[T]he plain meaning of this statute controls unless the language is ambiguous or leads to absurd results.").  "Compensatory damages" are defined as those damages that "will compensate the injured party for the injury sustained, and nothing more;  such as will simply make good or replace the loss caused by the wrong or injury."  Black's Law

no damages.  A purpose to tide an employee over a period of readjustment would not seem to have much relevance to the issue of whether the payments are liquidated damages or part of the compensation package.  For example, a pension plan is similarly intended to tide employees over the period of their retirement, yet, pension plans are clearly part of the compensation package and not liquidated damages for the termination of employment.

Dictionary (6th Ed.1991). "Actual damages," roughly synonymous with compensatory damages, are defined as "[r]eal, substantial and just damages, or the amount awarded to a complainant in compensation for his actual and real loss or injury, as opposed ... to "nominal' damages [and] "punitive' damages." *Id.*[15] Finally, "[d]irect damages are such as follow immediately upon the act done." *Id.* Thus, "actual direct compensatory damages" appear to include those damages, flowing directly from the repudiation, which make one whole, as opposed to those which go farther by including future contingencies such as lost profits and opportunities or damages based on speculation. *See OPEIU,* 27 F.3d at 602; *RTC v. Management, Inc.,* 25 F.3d 627, 632 (8th Cir.1994) (holding that neither penalties designed to dissuade a party from breaching nor liquidated damages are compensable under FIRREA).

We believe McMillian's damages fall within the plain meaning of the terms "actual," "direct," and "compensatory" damages. The precise nature of the injury for which he seeks damages is clarified by viewing McMillian's severance pay as part of his compensation package. McMillian's injury was his being discharged *without receiving the compensation due him* under the terms of the Severance Plan. A significant flaw in the FDIC's view of this case is its mischaracterization of the act triggering potential damages and the injury for which potential damages may be appropriate. The triggering act is not merely the discharge of McMillian, but more

---

[15]According to *Corpus Juris Secundum,* " "Compensatory damages' and "actual damages' are synonymous terms ... and include[ ] all damages other than punitive or exemplary damages." 25 C.J.S. Damages § 2 (1966).

precisely, the discharge without paying McMillian the compensation due him. The relevant injury for which there are potential damages is McMillian's having been discharged without payment of the compensation due him. Such injury is analogous to discharging an employee without giving him his last paycheck; i.e., without paying him compensation already earned. Contrary to the FDIC's characterization, the relevant injury is not the difficulty and perhaps inability of McMillian to obtain new and equivalent employment. Instead, to compensate McMillian for having been discharged without the payments agreed upon, the appropriate damages would be measured by the agreed-upon payments. It is through these payments that McMillian is made whole. The damages are clearly compensatory; the loss caused by the injury is simply replaced. The dollar amount he would receive is the *actual* amount due, and his damages flow *directly* from FDIC's repudiation (i.e., its refusal to honor the severance pay obligations). Thus, an award to McMillian would fall well within the term "actual direct compensatory damages."

The statutory language in 12 U.S.C.A. § 1821(e)(3)(B) provides some support for our conclusion. As noted *supra,* § 1821(e)(3)(B) expressly provides that the phrase does not include punitive damages, lost profits or damages for pain and suffering. Although it is probable that the listing in the statutory provision is not exclusive, it provides some support for our conclusion in this case; McMillian's severance payments are not at all like the listed exclusions. The damages here are clearly not in the nature of punitive damages. Rather, the damages would precisely

compensate McMillian for not having been paid the amounts previously agreed to be part of his compensation package. Similarly, such damages are clearly not in the nature of profits or damages for pain and suffering.

Our conclusion also derives strong support from the golden parachute amendment. *See supra* note 10. It is clear from the provisions of this amendment that Congress contemplated that some severance payments would fall within the phrase "actual direct compensatory damages." Otherwise, the golden parachute amendment would be wholly unnecessary because the FDIC would already be protected (i.e., by the "actual direct compensatory damages" provision) from liability for paying any severance payments. Moreover, the golden parachute amendment provides strong support for the proposition that the particular Severance Plan in this case was of the kind which Congress intended for the FDIC to honor. The statute expressly indicates that Congress intended that qualified retirement plans and "other nondiscriminatory benefit plan[s]" are permissible. 12 U.S.C.A. § 1828(k)(4)(C)(i). Also permissible is "any payment made pursuant to a bona fide deferred compensation plan or arrangement which the Board determines, by regulation or order, to be permissible." 12 U.S.C.A. § 1828(k)(4)(C)(ii). The Severance Plan in this case is apparently nondiscriminatory, applying to all employees with over two years of service, and providing for increase in benefits according to years of service. Indeed, the FDIC's proposed regulations expressly contemplate the permissibility of nondiscriminatory severance pay plans like the instant plan. 60 Fed.Reg. 16069, 16070 (to be codified at 12

C.F.R. Pt. 359.1(f)(2)(4)) (proposed March 29, 1995).[16]

For the foregoing reasons, we reject the FDIC's argument that McMillian's severance payments do not qualify as "actual direct compensatory damages." The judgment of the district court cannot be affirmed on this theory.

## III. CONCLUSION

Accordingly, the decision of the district court is reversed and the case is remanded for proceedings consistent with this opinion.

REVERSED and REMANDED.

.    .    .    .    .

.    .    .    .    .

---

[16]We also note that § 1828(k) and the proposed regulations suggest several considerations which might lead to disallowance of severance payments. These considerations are not relevant to our disposition of this case.